879 F.2d 1037
 14 Fed.R.Serv.3d 1251
 Charles MERIWETHER, Jr., individually and on behalf of all
others similarly situated,
Plaintiff-Appellant-Cross-Appellee,
v.
Thomas A. COUGHLIN, III, Commissioner of the New York State
Department of Correctional Services; Charles Scully,
Superintendent of Green Haven Correctional Facility; Steven
Dalsheim, Superintendent Downstate Correctional Facility,
and David R. Harris, Ex-Superintendent of Green Haven
Correctional Facility, Defendants-Appellees-Cross-Appellants.
 Nos. 821, 925, Dockets 88-2406, -2408.
 United States Court of Appeals,
Second Circuit.
 Argued March 20, 1989.
Decided June 30, 1989.
 
 Eliot Lauer, Curtis, Mallet-Prevost, Colt & Mosle, New York City (Samuel Rosenthal, Daniel O'Brien, of counsel), for appellants.
 Barbara B. Butler, Asst. Atty. Gen. (Robert Abrams, Atty. Gen. of the State of N.Y., Charles F. Sanders, Jo Ann M. Becker, Asst. Attys. Gen., of counsel), for appellees.
 Before OAKES, Chief Judge, MAHONEY, Circuit Judge, and WOOD, District Judge.*
 OAKES, Chief Judge:
 
 
 1
 This class action involves the claims of New York State prisoners that their civil rights were violated when they were transferred to different prisons and beaten in 1980. After a jury found for the plaintiffs on all of their claims, the United States District Court for the Southern District of New York, Charles E. Stewart, Senior Judge, entered judgment n.o.v. in favor of the defendants on the plaintiffs' First Amendment and due process claims. He accepted the verdict on their Eighth Amendment claim, but he set aside an award of punitive damages. Because the jury did not award Eighth Amendment damages separately from the damages for the other claims, he ordered a new trial on damages. See Meriwether v. Coughlin, No. 80 Civ. 4712 (S.D.N.Y. July 8, 1988) (hereinafter Mem.Decis.). In order to avoid the possibility of an unnecessary second trial, he certified his decision for interlocutory appeal pursuant to 28 U.S.C. Sec. 1292(b), see Meriwether v. Coughlin, No. 80 Civ. 4712 (S.D.N.Y. Aug. 12, 1988) (hereinafter Certification Order), and we accepted the appeal and cross-appeal.
 
 
 2
 We affirm in part, reverse in part, and remand for determination of one plaintiff's damages.
 
 I. BACKGROUND
 
 3
 The fifteen members of the plaintiff class were prisoners at the Green Haven Correctional Facility in July of 1980. Green Haven, a maximum security state prison, is located in Dutchess County, New York, and is one of the most convenient prisons for prisoners from New York City to receive visitors; it is one of the six major maximum security prisons in New York. As the district court noted, Green Haven was a "troubled" institution in 1980.
 
 
 4
 Plaintiffs introduced into evidence a New York State Commission of Investigation report entitled "Corruption and Abuses in the Correctional System: The Green Haven Correctional Facility" (hereinafter Report). The Commission issued an interim report on July 15, 1980, see Report at 1, and a final report in May of 1981. The final report concluded that "corruption on a large and regular scale became institutionalized" at Green Haven, with prisoners buying favors from guards. "Security and morale ... suffered a substantial breakdown," and "visiting rooms ... became major staging areas for smuggling contraband." Id. at 3. Although not all correctional officials were corrupt, "honest officers failed to report the corruption and favor taking.... They were demoralized. The malfeasance was institutionalized and seemed to be accepted even by certain supervisors." Id. at 5. On June 22, 1980, two prisoners escaped from Green Haven by walking out of the visiting area, and on July 18 a prisoner escaped by walking away from his job tending the grounds. Id. at 122-25, 130. The interim report, which was released on July 15, revealed that a 1978 escape had occurred after a prisoner bribed his guards to allow him to go to a hotel for sex. See id. at 90-91. The last page of the interim report, which was also admitted into evidence, concluded that "[i]n the last analysis, then, [the prisoner] was able to escape because Green Haven Prison was permeated by a system of corruption." State of New York Commission of Investigation, Interim Report on the Escape of Albert Victory, at 31 (July 15, 1980).
 
 
 5
 The defendants presented evidence that during the spring of 1980, inmate informants warned of plans for a violent insurrection at Green Haven. The defendants claimed that a legitimate inmate group, the Creative Communications Committee, had become a front for the Black Liberation Army, an organization that, according to the defendants, advocated revolutionary violence. Many of the plaintiffs were members of the Creative Communications Committee. The plaintiffs, on the other hand, argued that insurrection was not imminent. They argued that prison officials were disturbed by plaintiffs' exercise of their First Amendment rights, and they introduced evidence that some of them had tried to attract attention to the corruption at Green Haven by writing letters to a local newspaper, various officials, and public interest groups, and that many of the plaintiffs were members of inmate organizations.
 
 
 6
 On July 18, 1980, officials reduced the visiting hours at Green Haven. On Sunday, July 20, almost all of the prisoners participated in a silent meal strike. They went through cafeteria lines but did not select any food. That day, David Harris, who was then Superintendent of the prison, met with the Inmate Liaison Committee, which was a group of inmates elected to communicate grievances to officials. The committee members informed Harris that other inmates wanted to meet with him. He agreed to do so and directed that representatives of various inmate organizations and three representatives from each cell block (one white, one black, and one Hispanic) should attend.
 
 
 7
 The following day, July 21, thirty or forty inmates attended the meeting. Several of the plaintiffs attended. The meeting was taped and later broadcast over the prison's public address system. Several officials promised that no inmates would be transferred because of their attendance at the meeting. Although the inmates did not present their criticisms of Green Haven in, as the district court put it, "any systematic fashion," Mem.Decis. at 8, they requested an outside panel to review their concerns and sought interviews with the media. After the meeting with officials, some of the inmates met to attempt to formulate a list of grievances, and that meeting was broken up by guards.
 
 
 8
 On July 22, defendant Coughlin, who was then and is now the Commissioner of the New York State Department of Correctional Services, transferred Superintendent Harris to a different job and appointed defendant Scully to the position of Superintendent of Green Haven. Coughlin also authorized a "lockdown" and "frisk" of the facility, which lasted until July 24. During the lockdown, inmates were generally confined to their cells. The search was conducted by a Correctional Emergency Response Team ("CERT"). No weapons were discovered in the cells of the plaintiffs.
 
 
 9
 On July 24, forty inmates, including the plaintiffs, were transferred out of Green Haven. Coughlin gave general instructions that inmates should be transferred. Three of Scully's subordinates created a list of candidates for transfer. Scully and another official then chose the forty inmates that were transferred. Although none of the officials admitted that attendance at the July 21 meeting was considered as a criterion for transfer, the preliminary list of candidates, which was introduced into evidence, indicates whether inmates attended the meeting.
 
 
 10
 Many of the plaintiffs testified that they were physically abused by CERT officers as they were being prepared for transfer. The inmates were taken to Downstate Correctional Facility for approximately two weeks, and several of the plaintiffs also testified that they were physically abused at Downstate. They were then transferred to other maximum security facilities. Those transferred to Comstock testified that they were beaten upon arrival by a gauntlet of correctional officials wielding batons. Plaintiffs introduced evidence that Coughlin's office had described them to the press as terrorists who had created a "hit list" of correctional officers to kill at Green Haven, and they argued that the press releases caused the physical abuse.
 
 
 11
 The trial was held in 1987. The jury found that Coughlin and Scully had violated the First Amendment rights of fourteen of the original class of twenty-one plaintiffs by transferring them in retaliation for speech, but that Scully had established the defense of qualified immunity for that claim. The seven plaintiffs who attended the July 21 meeting also claimed that their due process rights had been violated. The jury found that Coughlin and Scully had transferred five of them in violation of their due process rights, but it found that Scully had also established qualified immunity on this claim. Finally, the jury found that twelve of the plaintiffs were deprived of their Eighth Amendment right to be free of cruel and unusual punishment, and the jury found both Coughlin and Scully liable on this claim. The jury awarded the prevailing plaintiffs individual damages varying from $500 to $5,025, and it awarded punitive damages of $500,000 from Coughlin and $250,000 from Scully.
 
 
 12
 Judge Stewart entered j.n.o.v. on the First and Fourteenth Amendment claims, reasoning that any constitutional infringements that might have occurred would have been justified by legitimate penological goals. He set aside the award of punitive damages and certified his decision for appeal. The plaintiff-appellants seek to have judgment entered in accordance with the verdict. The defendants, in addition to arguing in support of Judge Stewart's decision, argue that the elements of First and Fourteenth Amendment liability were never proven, and on their cross-appeal argue that Eighth Amendment liability was not proven and that various evidentiary errors and examples of jury confusion justify a new trial.
 
 II. DISCUSSION
 
 13
 A. The Timeliness of the Motion for Judgment N.O.V.
 
 
 14
 Plaintiffs argue that the district court did not have jurisdiction to rule on the defendants' motion for j.n.o.v. because, plaintiffs claim, the motion did not comply with Fed.R.Civ.P. 50(b), which required the motion to be made "[n]ot later than 10 days after entry of judgment." We conclude that the motion was timely.
 
 
 15
 The jury returned its verdict on July 6, 1987. This exchange then occurred between the court and defendants' lawyer:
 
 
 16
 MR. COHEN: I would, your Honor, like to at this time note that defendants wish to move for a judgment notwithstanding the verdict.
 
 
 17
 THE COURT: You are going to file some papers?MR. COHEN: I would like, your Honor--I know the usual Federal Rules are ten days. You also know that I'm not going to be able to comply with that ten day rule since I'm going to take a two week vacation after this. I would like your Honor's indulgence, and I would like to file papers in this matter.
 
 
 18
 THE COURT: When would you propose to file them?
 
 
 19
 MR. COHEN: If possible, your Honor, sometime in August.
 
 
 20
 Judge Stewart then set August 17 as the date for defendants to file their papers. Judge Stewart later wrote that he gave the parties until August 19 "to file their post-trial motion papers" and that he granted a further extension at defendants' request. See Mem.Decis. at 2; see also Certification Order at 2 (noting that court granted several extensions for briefing of post-trial motions because of attorneys' vacations and illnesses). An order dated August 5 stated, "[T]he defendants shall submit their motion for a judgment notwithstanding the verdict on or before September 17." A judgment based on the jury's verdict was filed August 19. On August 28, defendants filed a "Notice of Motion" for j.n.o.v. or a new trial. We cannot treat this notice as a timely motion for j.n.o.v., even though it was filed within ten days of the entry of judgment, because it states that defendants "will move ... [on] October 1." On September 18, defendants filed a memorandum of law in support of the motion, and that memorandum sought j.n.o.v., a new trial, or other relief.
 
 
 21
 In the opinion ruling on the motion, Judge Stewart wrote that defendants had made an oral motion for j.n.o.v. "sufficient to meet Rule 50(b)'s time strictures" on July 6. Mem.Decis. at 3 n. 3 (citing Warkentien v. Vondracek, 633 F.2d 1, 2 n. 1 (6th Cir.1980)); see also Certification Order at 2 (saying defendants moved orally for j.n.o.v.). Plaintiffs, pointing to Mr. Cohen's language in the exchange quoted above, argue that no motion was made on July 6. They note that Mr. Cohen said that defendants wished to move for j.n.o.v. and that he admitted that he could not "comply with that ten day rule." Defendants answer that Judge Stewart properly viewed Mr. Cohen's statement as a motion which was supplemented by the papers filed later.
 
 
 22
 We begin by acknowledging, as did the district court, see Mem.Decis. at 3 n. 3, that the trial court cannot enlarge the ten-day time period specified by Rule 50(b). Federal Rule of Civil Procedure 6(b) states that a court "may not extend the time for taking any action under Rule[ ] 50(b) ... except to the extent and under the conditions stated in [it]," and Rule 50(b) has no provision for enlargement. In Lapiczak v. Zaist, 451 F.2d 79 (2d Cir.1971), we held that the rule against the discretionary enlargement of certain time periods is "mandatory and jurisdictional and ... cannot be circumvented regardless of excuse." Id. at 80 (improper to enlarge time period allowed by Rule 59(d)); see also 9 C. Wright & A. Miller, Federal Practice and Procedure Sec. 2537, at 601 (1971). A request for an extension of time to file a motion seeking j.n.o.v. or a new trial is ineffective even if it is received without objection and granted by the court. Hulson v. Atchison, Topeka & Santa Fe Ry., 289 F.2d 726, 728-29 (7th Cir.), cert. denied, 368 U.S. 835, 82 S.Ct. 61, 7 L.Ed.2d 36 (1961). The question, then, is whether Mr. Cohen's statements constituted an oral motion or an expression of desire to file a subsequent (and tardy) written motion.
 
 
 23
 We agree with the district court that the statement "I would ... like to ... note that defendants wish to move" was a motion; we believe that the use of subjunctive and precatory language reflected politeness, rather than any disinclination to make the motion. This case is distinguishable from Hulson, in which the appeals court accepted the district court's finding that the statement "I am merely asking for an extension of time in which to file my motion" was not an oral motion. Id. at 727, 729. The language in Hulson was much clearer, and the trial court in that case, unlike this one, had rejected the movant's interpretation of the language. Likewise, plaintiffs cannot rely on Mr. Cohen's statement that he could not comply with the ten-day rule; Mr. Cohen's opinion of the effect of his actions is not controlling.[1]
 
 
 24
 Plaintiffs also argue that the oral statement cannot be viewed as a motion because it was not filed or served and because it was not supported by a memorandum. As plaintiffs note, Local Civil Rule 3(b) of the Southern District of New York contemplates written support for motions:
 
 
 25
 Upon any motion the moving party shall serve and file with the motion papers a memorandum setting forth the points and authorities relied upon.... Failure to comply may be deemed sufficient cause for the denial of the motion or the granting of the motion by default.
 
 
 26
 Federal Rule 7(b), however, does not require that all motions be supported by a writing:
 
 
 27
 An application to the court for an order shall be by motion which, unless made during a hearing or trial, shall be made in writing, shall state with particularity the grounds therefor, and shall set forth the relief or order sought. The requirement of writing is fulfilled if the motion is stated in a written notice of the hearing of the motion.
 
 
 28
 Fed.R.Civ.P. 7(b)(1). Because the oral motion was made in open court, Rule 7(b) applies and written support was not necessary. See Witt v. Merrill, 208 F.2d 285, 286 (4th Cir.1953) (per curiam) (Rule 7(b) authorized oral motion for new trial that was made upon return of verdict); see also IBM Corp. v. Edelstein, 526 F.2d 37, 47 (2d Cir.1975) (quoting Witt with approval and holding that district court may not refuse oral motions); Douglas v. Union Carbide Corp., 311 F.2d 182, 185 (4th Cir.1962) (oral motion for new trial made upon announcement of verdict is made "during" trial and permitted by Rule 7(b)); see also 5 C. Wright & A. Miller, supra, Sec. 1193 (1969). Local Rule 3 cannot, of course, be construed to contradict the federal rule. See Fed.R.Civ.P. 83 (authorizing local rules "not inconsistent" with the federal rules). We conclude that the motion for j.n.o.v. was timely.[2]
 
 
 29
 The district court judge also found that the defendants' oral motion for j.n.o.v. met Rule 59's time requirements and that he could accordingly consider the motion for a new trial. We need not determine whether the court had jurisdiction to consider the new trial motion. Although Judge Stewart ordered a new trial to determine which compensatory damages were due for the Eighth Amendment claim apart from the First Amendment and due process claims, see Mem.Decis. at 37-38, he ordered the new trial sua sponte, rather than on the defendants' motion, see id. at 51 ("Defendants' motion in the alternative for a new trial on liability is denied on all three claims. However, a new trial on the issue of damages ... is granted.").
 
 
 30
 B. The Entry of Judgment N.O.V. on the First and Fourteenth Amendment Claims
 
 
 31
 The district court entered j.n.o.v. for Coughlin, whom the jury found liable on the First Amendment and due process claims, because the court found that the transfers were rationally related to a legitimate penological goal. We reverse as to the First Amendment claim and affirm as to the due process claim.
 
 1. The First Amendment Claim
 
 32
 Judge Stewart entered j.n.o.v. in reliance on two recent Supreme Court cases that address the permissible extent of infringement upon prisoners' rights. In Turner v. Safley, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), and O'Lone v. Estate of Shabazz, 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987), the Court addressed prison regulations that burdened prisoners' constitutional rights. As Turner, which concerned a free speech claim, put it, such a regulation must be "reasonably related to legitimate penological interests." 107 S.Ct. at 2261; see also Thornburgh v. Abbott, --- U.S. ----, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989). Turner also listed several factors relevant to assessment of the regulation's reasonableness. Id., 107 S.Ct. at 2262. Both Turner and O'Lone are further explicated and given due deference in Fromer v. Scully, 874 F.2d 69 (2d Cir.1989), a case involving prison regulations concerning the length of beards.
 
 
 33
 Judge Stewart certified this case for interlocutory appeal because he found that Turner announced a "new standard" of liability.[3] Certification Order at 3. Appellate consideration might also be appropriate due to the fact that this case involved an official response to a supposed immediate threat, while Turner and O'Lone involved regulations. Our analysis, however, is governed by the defendants' tactical shifts and the case's procedural history rather than by subtleties of the developing law.
 
 
 34
 The entry of j.n.o.v. was improper because the defendants had not moved for a directed verdict on the grounds that the district court accepted as a basis for j.n.o.v. Defendants, in fact, dramatically revised their theory of the case after the verdict was returned. At trial, the defendants tried to convince the jury that the plaintiffs were involved in plans to orchestrate a violent insurrection and that the decision to transfer them was unrelated to their speech. Defendants' lawyer, for example, stated at closing argument, "They weren't transferred for attending a meeting. They were transferred because they were trying to kill people. They were trying to take over an institution. That is why they were transferred." He later added, "All of this business about [the] First Amendment, it is not applicable. They weren't transferred because they spoke out. They were transferred because they were prepared to do terrible things. That is why they were transferred."
 
 
 35
 The jury, of course, rejected this argument, and the district court agreed that a reasonable jury could find that the plaintiffs were transferred solely because of their speech rather than because of suspicion of violent activity. The district court, however, reasoned that the transfers were permissible because no reasonable jury could find that the transfers were not rationally related to the legitimate goal of avoiding an insurrection. Judge Stewart found no evidence that the defendants had fabricated their testimony that they feared an insurrection, and he held that any jury finding to this effect could only result from impermissible speculation. The officials, he held, might reasonably have acted to avoid an insurrection planned by other, unnamed prisoners, by transferring the plaintiffs, "inmates able to articulate inmate grievances," in order to "cultivat[e] disunity and lack of leadership among inmates." Mem.Decis. at 19; see also id. at 23.
 
 
 36
 We reject the district court's analysis because it was unfair and it would be unsound to enter judgment n.o.v. based on a theory of the case that is different from that the defendants espoused at trial. The defendants' motion for j.n.o.v. rested on a depiction of the facts that was at odds with the defendants' stance during the trial. After the jury found that the transfers were retaliatory, Judge Stewart allowed the defendants to argue that retaliatory transfers were justified because the defendants reasonably feared an insurrection. This argument, however, was not made in the motion for a directed verdict.
 
 
 37
 The defendants' motion for a directed verdict, made at the close of all the evidence, was supported in part by this argument:
 
 
 38
 With respect to the First Amendment claim, it seems that based upon all of the evidence taken together in this case that there is absolutely no indicia that these individuals were transferred from Green Haven based upon their attendance at a meeting. In fact quite the opposite.
 
 
 39
 The evidence has been overwhelming that the reasons that they were transferred were because specifically they were involved in subversive activity in prison, and they had poor disciplinary records and had also been involved in violent crimes....
 
 
 40
 The trial court should never have considered the defendants' argument that j.n.o.v. should be entered on grounds so different from these.
 
 
 41
 Because a motion for j.n.o.v. is technically a renewal of a motion for a directed verdict, it cannot assert a new ground. 9 C. Wright & A. Miller, supra, Sec. 2537, at 598 (1971); see also Baskin v. Hawley, 807 F.2d 1120, 1129-30, 1134 (2d Cir.1986). This requirement comes from the language of Rule 50: One moves "to have the verdict ... set aside and to have judgment entered in accordance with his motion for a directed verdict." It prevents a party who loses at trial from using a j.n.o.v. motion as a "trap" after it is too late for the winner of the verdict to cure any alleged deficiencies of proof. Oliveras v. American Export Isbrandtsen Lines, Inc., 431 F.2d 814, 816-17 (2d Cir.1970) (quoting 5 Moore's Federal Practice para. 50.08, at 2359); see also Ebker v. Tan Jay Int'l Ltd., 739 F.2d 812, 824 & n. 14 (2d Cir.1984).
 
 
 42
 Defendants argue that their directed verdict motion generally questioned the sufficiency of the evidence and was broad enough to permit their j.n.o.v. argument. We disagree, because the grounds stated in the directed verdict motion are logically inconsistent with the defendants' subsequent theory. If defendants intended to argue that retaliatory transfers were a reasonable response to an uprising planned by other prisoners, they should have moved for a directed verdict on that ground by submitting to the trial court the questions of the sufficiency of evidence of official fabrication of the uprising threat and the reasonableness of transferring articulate prisoners to quell unrest. See Baskin, 807 F.2d at 1129-30 (defendant cannot seek reversal arguing that there was insufficient proof of an element of liability if its motion for a directed verdict did not include this ground); Bonjorno v. Kaiser Aluminum & Chemical Corp., 752 F.2d 802, 813-15 (3d Cir.1984) (noting that the "specific grounds" need to have appeared in the motion for a directed verdict), cert. denied, 477 U.S. 908, 106 S.Ct. 3284, 91 L.Ed.2d 572 (1986); Wall v. United States, 592 F.2d 154, 160-61 (3d Cir.1979). While relief from this requirement is available where necessary to avoid " 'manifest injustice,' " see Baskin, 807 F.2d at 1130 (quoting Sojak v. Hudson Waterways Corp., 590 F.2d 53, 54-55 (2d Cir.1978)), we cannot conceive that any such injustice occurred in this trial. It seems, rather, that the defendants "gambled" on the jury's verdict and only later, having lost, decided to raise their alternative argument. See 9 C. Wright & A. Miller, supra, Sec. 2536, at 594 (quoting Little v. Bankers Life & Casualty Co., 426 F.2d 509, 511 (5th Cir.1970)).
 
 
 43
 Moreover, even if the motion were properly considered, we do not agree with the district court that a jury determination that the officials fabricated their testimony about their fear of an uprising would be speculation. The entire trial rested on the jury's assessment of the witnesses' credibility. The plaintiffs, for example, convinced the jury to award them damages for cruel and unusual punishment in spite of the fact that the plaintiffs were unable to name their attackers or prove any medical injuries. The defendants argued, with a similar lack of corroborating evidence, that unnamed "reliable informants" in the inmate population had divulged plans for a violent Black Liberation Army uprising and that the plaintiffs were ringleaders in this plan. The district court accepted the jury's rejection of the asserted link between the plaintiffs and the insurrection plans, but it should also have accepted the jury's more general determination that the defendants' witnesses were not credible. The defendants' evidence of the supposed insurrection was thus not strong enough to warrant j.n.o.v. See Katara v. D.E. Jones Commodities, Inc., 835 F.2d 966 (2d Cir.1987) (judgment n.o.v. appropriate where jury's findings could only have been the result of sheer conjecture and overwhelming evidence shows that a reasonable jury could not arrive at a verdict against movant); Ebker, 739 F.2d at 825 & n. 16.
 
 2. The Due Process
 
 44
 Claim Judge Stewart entered j.n.o.v. on the due process claim because he applied the reasoning he had used on the First Amendment claim. He held that even a transfer that impinged on a liberty interest would have been permissible under the Turner test. Mem.Decis. at 27. We likewise would apply here our analysis of the First Amendment claim, although we affirm the entry of j.n.o.v. for other reasons. There was undue disparity between the motion for a directed verdict and the motion for judgment n.o.v. Defense counsel said in support of the motion for a directed verdict:
 
 
 45
 [W]ith regard to the claim of due process, I would move that that be dismissed too for the reasons which I stated to your Honor yesterday to the extent that these individuals were not entitled to a hearing prior to a transfer, that inmates themselves, with the exception of inmate's grievance review committee members, are not entitled to hearing prior to transfer.
 
 
 46
 Thus, prior to the motion for j.n.o.v., defendants argued only that there was no constitutional infringement. Because they had never argued that a constitutional infringement was justified, the entry of j.n.o.v. on this ground was inappropriate. We do, however, affirm on other grounds. See infra at 22-25.
 
 
 47
 C. The Verdict on the First and Fourteenth Amendment Claims
 
 
 48
 Because the district court judge decided to award j.n.o.v. to the defendants, he did not reach all of the defendants' specific objections to the jury's finding that the plaintiffs' First and Fourteenth Amendment rights were violated. Because we reject the district court's approach, we must now address the defendants' other objections to the verdict. If the district court had considered these arguments, it would have done so on purely legal grounds. It is therefore appropriate for us to consider these arguments as opposed to remanding for consideration by the district court. Like the trial court, we should order the entry of judgment n.o.v. if "the evidence leads to only one reasonable conclusion when the witnesses' credibility and the weight of the evidence are not taken into account" and "the verdict was unreasonable taking the evidence in the light most favorable to the non-moving party." Proteus Books Ltd. v. Cherry Lane Music Co., 873 F.2d 502, 508 (2d Cir.1989). The test has also been stated to involve consideration whether there is "such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or ... there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [jurors] could not arrive at a verdict against [the movant]." Katara, 835 F.2d at 970 (quoting Mattivi v. South African Marine Corp., "Huguenot," 618 F.2d 163, 167-68 (2d Cir.1980)). We conclude that judgment on the verdict should be entered on the First Amendment claim, but not on the due process claim.
 
 1. The First Amendment Claim
 
 49
 The district court should order the entry of judgment on the verdict for the plaintiff as to the First Amendment claim. Prison officials have broad discretion to transfer prisoners. Montanye v. Haymes, 427 U.S. 236, 243, 96 S.Ct. 2543, 2547, 49 L.Ed.2d 466 (1976); Meachum v. Fano, 427 U.S. 215, 228, 96 S.Ct. 2532, 2540, 49 L.Ed.2d 451 (1976). They may not, however, transfer them solely in retaliation for the exercise of constitutional rights. See Hohman v. Hogan, 597 F.2d 490, 492-93 (2d Cir.1979) (per curiam) (section 1983 claim stated by complaint alleging retaliatory transfer to restrictive unit); see also Gill v. Mooney, 824 F.2d 192, 194 (2d Cir.1987) (section 1983 claim stated when otherwise routine administrative decisions are alleged to have been made in retaliation for exercise of constitutional rights). We agree with the district court that a reasonable jury could find that the plaintiffs were transferred solely because they exercised their First Amendment rights. Mem.Decis. at 14. First, we agree that the plaintiffs participated in speech. All but one were inmate leaders or outspoken critics of the administration.[4] Several corresponded with state officials and public interest organizations about the problems at Green Haven, and many attended the July 21 meeting at which media contact was demanded. Defendants cite to us the Supreme Court's approval of regulations restricting a prisoners' labor union in Jones v. North Carolina Prisoners' Labor Union, Inc., 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977), but we find that case unhelpful because it was primarily concerned with First Amendment associational rights. The Court permitted the regulation of collective activity, but it found First Amendment speech rights "barely implicated." Id. at 130, 97 S.Ct. at 2540.
 
 
 50
 We agree with the district court that "a reasonable jury could disbelieve defendants' assertion that plaintiffs were transferred because of their ties to the alleged planned insurrection or other violent activity." Mem.Decis. at 17. As the district court noted, the plaintiffs testified that they had no such ties, no weapons were discovered in their cells, and they were never disciplined for any such activity.
 
 
 51
 Defendant Coughlin argues that there was insufficient evidence of his personal involvement for him to be found liable. There is, of course, no vicarious liability in section 1983 actions. Williams v. Smith, 781 F.2d 319, 323 (2d Cir.1986). As the district court noted in its review of the Eighth Amendment claim, however, there was evidence that Coughlin personally directed the transfer of the inmates. Mem.Decis. at 33. He testified that he gave instructions that the inmates involved in the "disturbance" should be transferred. The jury could infer that he knew that retaliation for speech would occur.
 
 
 52
 Coughlin also argues that the jury should have found that he had established the defense of qualified immunity. The jury found that only Scully had established this defense. We find that the jury was properly instructed that Coughlin could establish the defense by proving that "he did not know that what he did was in violation of constitutional law and ... a competent New York State Commissioner of Corrections could not have been expected at the time to know that the challenged conduct was in violation of those constitutional rights." See Harlow v. Fitzgerald, 457 U.S. 800, 818-19, 102 S.Ct. 2727, 2738-39, 73 L.Ed.2d 396 (1982). Retaliatory transfers were clearly illegal in 1980. See Hohman, supra; McDonald v. Hall, 610 F.2d 16, 18 (1st Cir.1979); and Garland v. Polley, 594 F.2d 1220, 1222-23 (8th Cir.1979). A reasonable jury could find that a reasonable commissioner of corrections would be aware of this.
 
 2. The Due Process Claim
 
 53
 We affirm the entry of j.n.o.v. on the jury's finding that Coughlin was liable for due process violations, but we do not do so for the same reasons as the district court. The due process claim stems from official statements that no one would be transferred in retaliation for attendance at the July 21 meeting. The district court instructed the jury that those promises bestowed a liberty interest upon the plaintiffs. He told the jury that they had to find that the defendants "knew about the assurance given at the July 21st meeting ... and despite this knowledge transferred the plaintiffs because of their attendance at the meeting without affording them a hearing." As with the First Amendment claim, the jury found that Scully, but not Coughlin, had established qualified immunity, and the district court did not reach Coughlin's specific objections to the verdict.
 
 
 54
 It is well established that the transfer of a prisoner from one institution to another does not invoke the protection of the Due Process Clause. Hewitt v. Helms, 459 U.S. 460, 468, 103 S.Ct. 864, 869, 74 L.Ed.2d 675 (1983); Meachum, 427 U.S. at 225, 96 S.Ct. at 2538. A prisoner thus has no constitutional right to process before or after transfer from the general population of one New York State prison to another. Plaintiffs did not have a blanket liberty interest in remaining at Green Haven and, in the absence of a constitutionally impermissible official motive, they could have been transferred without a hearing for any reason.
 
 
 55
 Plaintiffs argue, however, that official assurances that they would not be transferred in retaliation for exercising their First Amendment rights created in them a liberty interest in remaining at Green Haven. Thus, they argue, they could not be transferred without compliance with the requirements of the Due Process Clause. See Hewitt, 459 U.S. at 471-72, 103 S.Ct. at 871-72; Hall v. Unknown Named Agents of the New York State Dep't for Correctional Servs., 825 F.2d 642, 645 (2d Cir.1987). We reject this suggestion. Defendants' assurances that the prisoners would not be transferred in retaliation for attendance at the July 21 meeting only reaffirmed existing statutory and decisional authority prohibiting retaliatory transfers.[5] It would be unworkable to have a rule that prisoners are entitled to procedural protection where officials are about to transfer them for an invalid reason, when these same prisoners would not be entitled to due process guarantees if the officials were transferring them for a valid reason. There is simply no way to pre-determine which transfers are for invalid reasons without providing all prisoners who are to be transferred with procedural protection. That prisoners do not have a right to such procedure is clear from the Supreme Court decisions cited above. See Hewitt, 459 U.S. at 468, 103 S.Ct. at 869; Meachum, 427 U.S. at 225, 96 S.Ct. at 2538. We therefore affirm the entry of j.n.o.v.
 
 
 56
 All five of the plaintiffs whom the jury found to have suffered due process violations were also found to have suffered First Amendment violations. Because the compensatory damages resulting from the two types of injury would have been the same, no new trial is necessary to separate damages.
 
 D. The Eighth Amendment Claim
 
 57
 The district court entered judgment on the jury's verdict for compensatory damages for the Eighth Amendment claim but set aside the award of punitive damages. We affirm.
 
 
 58
 We affirm as to the compensatory damages. The Eighth Amendment is, of course, the primary source of protection against excessive force for incarcerated convicts. Graham v. Connor, --- U.S. ----, ---- n. 10, 109 S.Ct. 1865, 1871 n. 10, 104 L.Ed.2d 443 (1989). First, we agree that there was sufficient evidence of excessive force. The plaintiffs testified that they were assaulted by guards, and there was no evidence that any physical abuse was necessary to transfer the plaintiffs. See Mem.Decis. at 29-30 (citing Corselli v. Coughlin, 842 F.2d 23, 26 (2d Cir.1988)). We also agree that there was enough evidence for the jury to impose supervisory liability. As the district court noted, supervisory liability may be imposed when an official has actual or constructive notice of unconstitutional practices and demonstrates "gross negligence" or "deliberate indifference" by failing to act. McCann v. Coughlin, 698 F.2d 112, 125 (2d Cir.1983). There was evidence that corrections officers at Green Haven and other facilities had heard rumors about the plaintiffs, that the plaintiffs' transfer orders described their alleged roles in the supposed insurrection, that Coughlin's press secretary stated to the press that the transferees had planned a violent overthrow, and that newspaper and radio reports may have reported that the plaintiffs were involved in such plans. Mem.Decis. at 31-32. Both Scully and Coughlin testified that they took no precautions to ensure the safety of the plaintiffs. Finally, we accept the district court's conclusion that a reasonable jury could find that the defendants should have known that the plaintiffs' reputations would "expose them to extreme hostility from corrections officers." Mem.Decis. at 34.
 
 
 59
 The defendants argue that we should require a heightened showing of liability because there was unrest at Green Haven, and they cite to us Whitley v. Albers, 475 U.S. 312, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986), which inquired whether force used in a riot was applied "maliciously and sadistically for the very purpose of causing harm." Id. at 320-21, 106 S.Ct. at 1085 (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir.), cert. denied, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973)). As plaintiffs argue, however, this standard is inapplicable because no riot was occurring at Green Haven, nor was there even, according to the jury, the degree of unrest that defendants claimed. Moreover, defendants did not argue that the standard was applicable during the trial. Defendants also argue that more than one incident is necessary to impose supervisory liability. See Oklahoma City v. Tuttle, 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985) (municipal liability). We note, however, that the testimony was that beatings occurred in three different facilities. We therefore affirm the award of compensatory damages. We affirm the district court's decision to set aside the award of punitive damages.
 
 
 60
 Judge Stewart held under our standards that the award shocked the judicial conscience, see Hughes v. Patrolmen's Benevolent Assoc. of New York, 850 F.2d 876, 883 (2d Cir.), cert. denied, --- U.S. ----, 109 S.Ct. 495, 102 L.Ed.2d 532 (1988); Zarcone v. Perry, 572 F.2d 52, 56-57 (2d Cir.1978), and would neither punish outrageous conduct nor deter similar behavior. Punitive damages may be available in section 1983 actions when conduct is motivated by evil motive or intent or when it demonstrates reckless or callous indifference to federally protected rights. Smith v. Wade, 461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983). The jury awarded punitive damages because it found that the defendants' conduct was malicious, wanton, or oppressive. We, of course, have already held that we do not share Judge Stewart's conclusion that the transfer decision was rationally related to protecting those at Green Haven, and his holding as to the First Amendment claim appears to have influenced his view of the punitive damages for the Eighth Amendment claim. See Mem.Decis. at 38. Even so, considering the defendants' lack of personal involvement in the beatings and the lack of evidence that they acted with evil motive or intent, we agree that the award may not stand.
 
 E. Alleged Trial Errors
 
 61
 Defendants argue that a new trial is necessary because some parts of the special verdict form indicate that the jury was confused. First, the jury found that Jerry Brown had suffered a First Amendment violation, but the district court could not find any evidence that Brown ever exercised any First Amendment right. Mem.Decis. at 15 n. 10. We, too, are unable to locate any evidence of Brown's exercise of his rights, and plaintiffs do not respond to this argument. We do not believe that this part of the verdict demonstrates sufficient jury confusion to warrant a new trial, but we order the entry of j.n.o.v. on Brown's First Amendment claim. Because he also won on the Eighth Amendment claim, a new trial is necessary to determine which part of his $550 award was due to the Eighth Amendment violation.
 
 
 62
 Defendants also argue that there was no evidence of other plaintiffs' speech, but we agree with the district court that the First Amendment claim was proven by the other plaintiffs. Defendants find it incongruous that the jury found Scully liable on the Eighth Amendment claims of some plaintiffs who were beaten at institutions other than Green Haven. Plaintiffs answer, however, that Scully could have been found liable for the injuries because he signed transfer orders which identified the plaintiffs as participants in the alleged insurrection plans, and we accept this argument. Defendants also point to the fact that Scully, but not Coughlin, was found to have established qualified immunity. We find it unsurprising that the jury would evaluate the liability of different defendants differently. Finally, defendants note that some plaintiffs who did not recover on the Eighth Amendment claim were awarded punitive damages. Plaintiffs inform us that this resulted from an error by counsel in drafting the judgment. This error, we agree, does not appear on the special verdict form and requires correction but not reversal.
 
 
 63
 Finally, we reject defendants' challenges to two evidentiary rulings. First, we agree that the trial court properly accepted, as a party admission under Fed.R.Evid. 801(d)(2)(A), evidence of Coughlin's testimony in a prior proceeding. See Mem.Decis. at 35 n. 22. In that testimony, Coughlin admitted knowing that corrections officers generally adhere to a "code of silence" and lie to conceal other officers' assaults on prisoners. This testimony was inconsistent with the defendants' position at trial because Coughlin argued that he had relied on his subordinates during the events in question.
 
 
 64
 The defendants also argue that the trial court improperly declined to admit direct evidence of the plaintiff-witnesses' convictions. Because the court admitted prison records which listed the plaintiffs' criminal convictions, any error that might have occurred would be harmless.
 
 
 65
 Affirmed in part, reversed in part, and remanded for a new trial to calculate the damages of one plaintiff.
 
 
 66
 MAHONEY, Circuit Judge, concurring in part and dissenting in part:
 
 
 67
 I join the majority in its determination that defendants' Rule 50 motion was timely, its affirmance of the judgment n.o.v. on plaintiffs' fourteenth amendment claim, and its reversal of the judgment n.o.v. on plaintiffs' first amendment claim. I would, however, grant a new trial on plaintiffs' first amendment claim, and would reverse the denial of judgment n.o.v. on plaintiffs' eighth amendment claim, and therefore respectfully dissent to this extent. As a result, I would not reach any damages issues, but agree with the majority that the district court properly set aside the jury's award of punitive damages.
 
 
 68
 A. First Amendment Claim.
 
 
 69
 I agree with the majority that defendants were not entitled to judgment n.o.v. on this claim, in view of the provision in Fed.R.Civ.P. 50(b) that a motion for judgment n.o.v. seeks "to have judgment entered in accordance with the party's motion for a directed verdict," and the construction that has been placed upon this rule by this and other courts that judgment n.o.v. is not properly awarded on a ground not advanced in the prior motion for a directed verdict. Baskin v. Hawley, 807 F.2d 1120, 1129-30 (2d Cir.1986).
 
 
 70
 I would, however, remand for a new trial on this claim. As mandated by Fed.R.Civ.P. 50(c)(1), the district court denied defendants' motion for a new trial on this claim while granting its motion for judgment n.o.v. thereon. Under these circumstances, it is appropriate for us to consider "after reversing the grant of judgment, ... whether judgment should be entered on the verdict or whether there should be subsequent proceedings." 9 C. Wright & A. Miller, Federal Practice and Procedure Sec. 2540, at 620 (1971) (footnotes omitted).
 
 
 71
 Although not explicitly addressing the question of a new trial, the majority concludes that while "[t]he district court accepted the jury's rejection of the asserted link between the plaintiffs and the insurrection plans, ... it should also have accepted the jury's more general determination that the defendant's witnesses were not credible [in asserting that any such plans existed]."
 
 
 72
 The district court summarized the evidence on this point, prior to a detailed consideration of it, as follows:
 
 
 73
 Eight corrections officials, all of whom were employed at Green Haven in the first half of 1980, testified that they had been told by informants in the facility that a violent insurrection was planned by inmates for some time in June or July 1980. Several of these witnesses testified that they had been told that the insurrection would take place on July 28, 1980.... These officers relayed this information to their superiors orally and in some instances in written memoranda, some of which were admitted into evidence. A number of these supervisors confirmed at trial that they received this information before plaintiffs were transferred.
 
 
 74
 The district court further determined that "[p]laintiffs offered nothing contradicting this evidence," and that any jury verdict that prison officials "concocted the alleged planned insurrection in order to justify the transfer, or that Coughlin[1] knew of such a scheme if it existed," would rest on impermissible speculation.
 
 
 75
 Because of the procedural posture in which this case reaches us, I need not consider whether the standard for judgment n.o.v. was met. See Katara v. D.E. Jones Commodities, Inc., 835 F.2d 966, 970 (2d Cir.1987) (judgment n.o.v. appropriate where jury verdict " 'could only have been the result of sheer surmise and conjecture' ") (quoting Mattivi v. South African Marine Corp., "Huguenot", 618 F.2d 163, 168 (2d Cir.1980)). At a minimum, however, I would defer to the district court's determination by concluding that the less stringent standard for granting a new trial, that "the jury has reached a seriously erroneous result or the verdict is a miscarriage of justice," Katara, 835 F.2d at 970 (citing cases), was met. I am fortified in this conclusion not only by the experienced district judge's opportunity to assess the credibility of the witnesses who testified on this issue, but also by the Supreme Court's recent reaffirmation that:
 
 
 76
 Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the Legislative and Executive Branches of Government. Prison administration is, moreover, a task that has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint. Where a state penal system is involved, federal courts have, as we indicated in [Procunier v. Martinez, 416 U.S. 396 [94 S.Ct. 1800, 40 L.Ed.2d 224] (1974) ], additional reason to accord deference to the appropriate prison authorities. See id., at 405 [94 S.Ct. at 1807].
 
 
 77
 Turner v. Safley, 482 U.S. 78, 84-85, 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64 (1987).
 
 
 78
 B. Eighth Amendment Claim.
 
 
 79
 The district court concluded that Scully and Coughlin could be found liable on this claim for the physical violence inflicted upon certain of the plaintiffs in the course of their transfers at the Green Haven, Downstate and Great Meadow correctional facilities because its infliction "was so foreseeable that defendants' inaction during the transfer rose to the level of deliberate indifference or reckless failure to supervise." This determination was based primarily upon the occurrence of physical abuse "in three correctional facilities within three weeks by different groups of corrections officers;" the court deemed this "pervasive misconduct" to provide a reasonable basis for a jury inference of recklessness by defendants "in ignoring the risk that plaintiffs would be physically abused during the course of their transfer." In addition, the district court specifically asserted that "Coughlin's press secretary issued press releases that stated that the transferees had been planning a violent overthrow of Green Haven,"[2] which "information was reported in the print and electronic media." The court concluded that the assaults in question should be considered "egregious not because they resulted in serious physical injuries, but because they were so widespread."[3]
 
 
 80
 The majority, in affirming, cites McCann v. Coughlin, 698 F.2d 112, 125 (2d Cir.1983), as establishing that "supervisory liability may be imposed when an official has actual or constructive notice of unconstitutional practices and demonstrates 'gross negligence' or 'deliberate indifference' by failing to act." The majority also notes that physical abuse occurred at three locations, satisfying the requirement expressed in City of Oklahoma City v. Tuttle, 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985), that more than one incident occur.
 
 
 81
 McCann, however, involved challenged procedures at inmate disciplinary hearings, as to which we imposed liability because of the defendants' "knowledge that unconstitutional practices were taking place, and their failure to act on the basis of this information." 698 F.2d at 125 (emphasis added). Here, on the contrary, the majority opinion and the district court premise liability upon defendants' reliance upon subordinates and established procedures to preclude the infliction of retaliatory physical abuse, and failure to anticipate the problems that in fact occurred.
 
 
 82
 In my view, the application of the concept of "constructive notice" to the facts of this case to impose liability for a failure to predict and prevent eighth amendment violations undercuts the long established rule that: "Respondeat superior or vicarious liability will not attach under Sec. 1983." City of Canton, Ohio v. Harris, --- U.S. ----, 109 S.Ct. 1197, 1203, 103 L.Ed.2d 412 (1989) (citing Monell v. New York City Dep't of Social Services, 436 U.S. 658, 694-95, 98 S.Ct. 2018, 2037-38, 56 L.Ed.2d 611 (1978)). In McCann, we rejected the defendants invocation of respondeat superior "because [defendants] had a sufficient degree of personal involvement in the unlawful practices" at issue. 698 F.2d at 125. Here, by contrast, there is no assertion that defendants knew anything about the physical abuse of the transferred prisoners until after it happened, or that prior such incidents had occurred which should have alerted defendants to the necessity of closer supervision or better training of their subordinates.
 
 
 83
 I note also that, in the admittedly different context of a claimed failure to train police officers to recognize when a person in custody requires medical treatment, City of Canton explicitly rejected a standard of gross negligence or recklessness in favor of the stricter standard of deliberate indifference. See 109 S.Ct. at 1201, 1206-07. This may indicate that the basic standards of liability applied both here and below are subject to question.
 
 
 84
 In any event, the district court imposed liability (while setting aside the award of punitive damages) on plaintiffs' eighth amendment claim because the defendants "erred by not anticipating the repercussions that would follow their decision to single out the plaintiffs for transfer." This strikes me as exactly the sort of 20-20 judicial hindsight which Turner v. Safley, echoing such prior Supreme Court admonitions as Bell v. Wolfish, 441 U.S. 520, 54849, 99 S.Ct. 1861, 1879, 60 L.Ed.2d 447 (1979) (citing cases), enjoins federal courts to avoid in reviewing the actions of prison authorities. I therefore respectfully dissent from the majority's affirmance of the district court's denial of judgment n.o.v. dismissing plaintiffs' eighth amendment claim.
 
 
 
 *
 Of the United States District Court for the Southern District of New York, sitting by designation
 
 
 [1]
 The same logic convinces us to ignore the defendants' "Notice of Motion" filed August 28 and their statements, in both the memorandum supporting the motion and the brief on appeal, that the motion "follow[ed]" the August 19 entry of judgment. See Defendants' Memorandum of Law filed Sept. 18, 1987, at 1; Defendants' Brief on Appeal at 3
 
 
 [2]
 We need not address the district court's reasoning that defendants' reasonable reliance on the granting of extensions constituted an excuse. See Mem.Decis. at 3 n. 3
 
 
 [3]
 We believe that the jury was properly instructed. The charge on the First Amendment claim stated in part:
 To summarize[,] if you find that the plaintiffs' protests were not the cause of the transfer, then you must find for the defendants on the plaintiffs' first claim. If, however, you find that the plaintiffs would not have been transferred if they had not spoken out, then you should consider whether the plaintiffs have established by a preponderance of the evidence that the infringement of their First Amendment rights was not supported by a reasonable justification. The reasonableness of the defendants' justification for the plaintiffs' transfer is to be judged by the correctional goals of maintenance of institutional security against escape or unauthorized entry, preservation of internal order and discipline and rehabilitation of prisoners. There must be a rational connection between one or more of these goals and the defendants' justification for the transfer.
 
 
 [4]
 The district court noted that there was no evidence that Jerry Brown was transferred because of the exercise of his First Amendment rights. Mem.Decis. at 15 n. 10. See infra at 28 for further discussion of Brown's claim
 
 
 [5]
 New York Correction Law Section 138(4) (McKinney 1987) provides:
 Inmates shall not be disciplined for making written or oral statements, demands, or requests involving a change of institutional conditions, policies, rules, regulations, or laws affecting an institution.
 See also Salahuddin v. Harris, 657 F.Supp. 369, 376 (S.D.N.Y.1987) (section 138(4) "suggests that New York views the broad exercise of inmates' First Amendment rights as consistent with its own penological interests and the order and security of the inmate population.")
 
 
 [1]
 The jury found for Scully on the first amendment claim on the basis of qualified immunity, so only Coughlin contests the jury verdict on this claim
 
 
 [2]
 The transcript reference to which the district court cites appears to establish that Coughlin's press secretary made oral statements to the press on the day that the transfer from Green Haven was initiated, but does not indicate that any press releases were issued
 
 
 [3]
 The evidence of "widespread" violations is somewhat ambiguous, in view of the fact that these transfers involved four other locations as to which no evidence of physical abuse was presented. Further, as the district court indicated, there was no medical evidence of injury at any location