Karen A. MURPHY, Esq., Plaintiff,

v.

The NEW YORK RACING ASSOCIATION, INC. ("NYRA"); Kenneth Noe, Jr., as Chairman of the Board of Trustees and Chief Executive Officer of NYRA and individually; Terence Meyocks, as President and Chief Operating Officer of NYRA and individually; Timothy M. McGinn, as Vice Chairman of the Board of Trustees an individually; Joseph V. Shields, Jr., as Vice Chairman of the Board of Trustees and individually; H. Douglas Barclay, as Trustee of the Board ("Trustee") and individually; Chester Broman, Sr., as Trustee and individually; Joseph M. Cornacchia, as Trustee and individually; Allan R. Dragone, as Trustee and individually; Robert S. Evans, as Trustee and individually; Albert Fried, Jr., as Trustee and individually; Richard L. Gelb, as Trustee and individually; Charles E. Hayward, as Trustee and individually; James P. Heffernan, as Trustee and individually; John A. Hettinger, as Trustee and individually; Peter F. Karches, as Trustee and individually; J Bruce Llewellyn, as Trustee and individually; Earle I. Mack, as Trustee and individually; John W. Meriwether, as Trustee and individually; Paul F. Oreffice, as Trustee and individually; Ogden Mills Phipps, as Trustee and individually; Dolph Rotfeld, as Trustee and individually; Lewis Rudin, as Trustee and individually; Peter G. Schiff, as Trustee and individually; Barry K. Schwartz, as Trustee and individually; Delbert Staley, as Trustee and individually; Daniel P. Tully, as Trustee and individually; Peggy Vandervoort, as Trustee and individually; Charles V. Wait, as Trustee and individually, Defendants.

No. 99 Civ. 2559.

United States District Court,
S.D. New York.

Dec. 6, 1999.

490

Kim P. Bonstrom, Bonstrom & Murphy, New York City, for Plaintiff.

Patricia Farren, Cahill Gordon & Reindel, New York City, for Defendants.

## OPINION

SAND, District Judge.

Plaintiff Karen A. Murphy ("Plaintiff") brings this action against The New York Racing Association ("NYRA"), two of NYRA's executive officers (Kenneth Noe, Jr. and Terence Meyocks), and NYRA's Board of Trustees, asserting numerous causes of action under the Civil Rights Act, 42 U.S.C. § 1983, and tortious interference with prospective economic advantage under New York State law. Presently before the Court is the Joint Motion to Dismiss Plaintiff's First Amended Complaint, pursuant to Federal Rule of Civil Procedure 12(b)(6), brought by the named NYRA Board of Trustees members, excepting Mr. Noe (collectively, "the Board Members" or "the Board Defendants").

### Background

The following facts are drawn from Plaintiff's First Amended Complaint, documents explicitly referenced therein, the parties' submissions pursuant to this Motion, and the transcripts of the oral arguments on this Motion, see *Koppel v. 4987 Corp.*, 167 F.3d 125, 128 (2d Cir.1999); *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47–48 (2d Cir.1991), and are assumed to be true for purposes of considering the Board Defendants' Motion.

Plaintiff is an attorney licensed to practice law in the State of New York, and the holder of a separate license issued by the New York State Racing and Wagering Board ("NYSRWB"). (*See* 1st Am.Comp. ¶¶ 2, 98.) Since approximately 1993, Plaintiff has represented individuals employed, engaged, or otherwise associated with thoroughbred horse racing in the State of New York. (*See id.* ¶ 39.) In January 1997, Plaintiff was appointed General Counsel for the New York Thoroughbred Horsemen's Association, Inc. ("NYTHA"), whose mission is the provision of benevolent assistance to individuals who work in the stable area of NYRA's race tracks. (*See id.* ¶ 40.)

The Board Defendants are members of the Board of Trustees of NYRA, a New York stock corporation organized as a nonprofit racing association under the authority of New York Racing, Pari–Mutuel Wagering & Breeding Law § 202. (*See id.* ¶ 9.) New York State has granted NYRA an exclusive franchise to operate the three

main thoroughbred horse racing tracks in New York: Belmont Park, Aqueduct, and Saratoga. All profits earned by NYRA are turned over to the State, and, upon its dissolution, all its assets are to be distributed by the Governor of New York. Every aspect of the day-to-day activities at NYRA's race tracks is supervised by the State. (*See id.* ¶¶ 66–68.) Eight of NYRA's twenty-eight Trustees are appointed by the Governor of New York. (*See id.* ¶ 122.) Pursuant to New York State law and NYRA's By-Laws, the Trustees have the duty to " 'remove or dismiss, after specification of and hearing on charges, any director or Trustee or executive officer of [NYRA] for inefficiency, neglect of duty, misconduct or malfeasance in office or waste or action considered not to be in the best interests of racing generally.' " (*Id.* ¶ 121 (*quoting* N.Y. Racing Law § 202).)

In the fall of 1997, Board Defendant Schwartz allegedly permitted Defendants Noe and Meyocks (N.Y.RA's executive officers) to falsely register the ownership of two of his horses in the name of their undercover investigator—pursuant to an investigation of Dr. Michael J. Galvin, a State-licensed equine veterinarian. On the basis of this investigation, Defendants NYRA, Noe, and Meyocks commenced an allegedly rigged disciplinary proceeding against Dr. Galvin. (*See id.* ¶¶ 126–28.)

On or about March 27, 1998, Dr. Galvin retained Plaintiff to represent him in connection with proceedings, brought by NYSRWB and NYRA, arising out of an incident that occurred on that date involving alleged "race-day treatment" of a filly named "HIP WOLF." (*See id.* ¶ 41.) In May 1998, Plaintiff again represented Dr. Galvin in an administrative hearing before a panel of NYRA officers, including Defendant Meyocks. Following four days of proceedings, the Panel voted to terminate Dr. Galvin's NYRA credentials. (*See id.* at ¶ 43.)

On the date the termination of Dr. Galvin's NYRA credentials was to take effect (June 8, 1998), Plaintiff, on behalf of Dr. Galvin, commenced a civil rights action in Federal District Court against Defendants NYRA, Noe, and Meyocks, and sought a temporary restraining order and preliminary injunction to prevent NYRA from terminating Dr. Galvin's credentials. The District Court denied the application for a temporary restraining order and referred the matter to a Magistrate Judge for a hearing on the preliminary injunction, which hearing commenced on June 18, 1998. (*See id.* ¶¶ 44–46.) On that same day, the NYTHA Board voted summarily to terminate Plaintiff as NYTHA General Counsel. Plaintiff alleges that immediately after this vote was taken, she was informed that she had been terminated because of her representation of Dr. Galvin. (*See id.* at ¶ 47.)

On June 20, 1998, Defendants Noe and Meyocks allegedly informed NYTHA's President that NYRA would not proceed with a planned NYTHA-sponsored day care center for stable employees so long as Plaintiff was involved with that project, and that, because of her representation of Dr. Galvin, NYRA would not have any further dealings with Plaintiff. On June 22, 1998, during the hearing on Dr. Galvin's preliminary injunction motion, Defendant Meyocks repeated these two claims and added that they were based on his belief (shared by Defendant Noe) that Plaintiff's representation of Dr. Galvin was not in the best interests of horse racing. (*See id.* ¶¶ 48, 49.)

Shortly after Dr. Galvin's administrative hearing in May 1998, Plaintiff was interviewed by Chester Broman, a member of the Board of Directors of the New York Thoroughbred Breeders, Inc. ("NYTB") regarding a vacancy on the NYTB Board. NYTB is a private association made up of breeders of thoroughbred race horses in New York. Mr. Broman allegedly informed Plaintiff of the Board's intention to offer the recently-vacated position on the Board to Plaintiff. (*See id.* ¶ 50.)

On June 20, 1998, however, Defendant Noe allegedly informed Mr. Broman that Plaintiff, because of her representation of Dr. Galvin, "was not to be appointed to the [NYTB] Board," and was "anti-NYRA." At the June 23, 1998 Board meeting, Broman allegedly conveyed to the Board Defendant Noe's negative remarks about Plaintiff. Plaintiff's proposed appointment to the NYTB Board was thereafter withdrawn. (*See id.* ¶¶ 52, 54, 55.)

On September 28, 1998, the District Court granted Dr. Galvin's motion for a preliminary injunction ordering NYRA to reinstate Dr. Galvin's credentials. On December 23, 1998, the Second Circuit affirmed. (*See id.* ¶¶ 58, 59.)

On December 4, 1998, while at NYRA's Belmont Park Racetrack to meet with Dr. Galvin on his case, as well as to transact business with other clients, Plaintiff was arrested and forcibly ejected from the Racetrack, despite allegedly being in possession of (i) a NYSRWB-issued license, (ii) NYRA credentials, and (iii) a NYRA-issued one-day visitor's pass. Plaintiff was allegedly later informed by NYRA's Director of Security that the arrest had been ordered by "legal or above"; i.e., either NYRA's General Counsel or even more senior executive officers. (*See id.* ¶¶ 60–63.)

Plaintiff commenced this action on April 8, 1999. On June 2, 1999, the Board Defendants moved to dismiss, and, on June 24, 1999, an oral hearing was held on that motion. On July 1, 1999, the Court granted Plaintiff leave to file an amended complaint, and Plaintiff filed her First Amended Complaint on July 23, 1999. The Board Defendants moved to dismiss the First Amended Complaint on August 11, 1999, and oral argument on the motion was heard on September 9, 1999.

Plaintiff's First Amended Complaint asserts that the Court has subject matter jurisdiction pursuant to 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331, 1343(3) and 1334(4), in that Plaintiff seeks redress for the violation of her constitutional and civil rights. Plaintiff asserts the following seven causes of action: (1) First Amendment retaliation; (2) violation of Fourteenth Amendment Due Process rights; (3) violation of Fourteenth Amendment liberty interest; (4) violation of Fourteenth Amendment property interest; (5) Fourteenth Amendment violation; (6) supervisory liability; and (7) tortious interference with prospective business advantage under New York State law.

## Legal Standard

On a motion to dismiss for failure to state a claim upon which relief may be granted, *see* FRCP 12(b)(6), we must "construe in plaintiff['s] favor factual allegations in the complaint. . . . Dismissal of the complaint is proper only where 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Automated Salvage Transp., Inc. v. Wheelabrator Envtl. Sys., Inc.,* 155 F.3d 59, 67 (2d Cir.1998) (*quoting Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)) (footnote omitted) (citation omitted).

## Discussion

To state a valid claim under Section 1983, Plaintiff must allege, first, that she was deprived of "rights, privileges, or immunities secured by the Constitution and laws," and, second, that this deprivation was perpetrated by a person acting "under color of [a state] statute, ordinance, regulation, custom or usage." 42 U.S.C. § 1983. Plaintiff advances two different Section 1983 claims involving the Board Defendants. First, she alleges that two of the Board Defendants, viz., Broman and Schwartz, *directly* violated her rights by "active[ly] participa[ting] in Defendants NYRA's, Noe's and Meyocks' unlawful and unconstitutional acts." (1st Am.Comp. ¶ 124.) Second, she alleges that all of the Board Defendants (including Broman and Schwartz) *indirectly* violated her rights by being "deliberately indifferent to their statutory and corporate duties to halt De-

fendants Noe's and Meyocks' unlawful, tortious and unconstitutional acts." (*Id.* at 41, 78 S.Ct. 99.) Hence, to satisfy the first Section 1983 requirement as regards the first of these claims, Plaintiff must sufficiently allege that Broman and Schwartz themselves violated her rights; whereas, to satisfy this requirement as regards the second, indirect claim, she must sufficiently allege both that the Board Defendants' supervisees, viz., Noe and Meyocks, directly violated her rights, and that the Board Defendants themselves indirectly violated her rights by failing to prevent Noe's and Meyocks' direct violations. *See Blyden v. Mancusi,* 186 F.3d 252, 265 (2d Cir.1999) ("Of course, for a supervisor to be liable under Section 1983, there must have been an underlying constitutional deprivation.").

Turning to the second Section 1983 element, viz., state action, since a determination of state action is focused on a defendant's conduct rather than his status, *see Polk County v. Dodson,* 454 U.S. 312, 319–20, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981), the allegation of state action in Plaintiff's direct violation claim could have been somewhat different than the allegation of state action in her indirect violation claim. In fact, however, both of Plaintiff's two state action arguments are presented in support of both claims.

We begin, in Section I, with a consideration of these two state action arguments—concluding that neither is successful. In Section II, we conclude that, even assuming Plaintiff had sufficiently alleged state action, both of her claims (i.e., the direct violation claim and the indirect violation claim) would fail in any event because neither sufficiently alleges a deprivation of constitutional rights. Finally, in Section III, we take up the Board Defendants' assertion of qualified immunity—concluding that, even assuming that Plaintiff's indirect violation claim had satisfied both of the Section 1983 requirements, it would have to be dismissed nonetheless

because the Board Defendants are entitled to assert qualified immunity in defense to it.[1]

## I. State Action

As noted, Plaintiff advances two arguments in support of her claims that the Board Defendants' conduct constituted state action. The first of these relies on one of the four tests developed by the Supreme Court for determining whether the conduct of an ostensibly private party qualifies as state action for the purposes of Section 1983, viz., the "symbiotic relationship" test. (*See* 1st Am.Comp. ¶ 5.) Second, she argues that the Board Defendants' conduct constituted state action because it involved a breach of duties imposed on them by state statute. (See id. ¶ 121.) We consider each of these arguments in turn.

### A. The Symbiotic Relationship Argument

Plaintiff alleges that the Board Defendants' conduct qualifies as state action because there exists a "symbiotic relationship" between NYRA and the State. This "symbiotic relationship test" for establishing state action was fashioned by the Supreme Court in *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 725, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). In attempting to satisfy the state action requirement under this rubric, Plaintiff has set herself a difficult task indeed—for two reasons. First, it is highly questionable whether this test remains viable. Second, even assuming that it is viable, because it was developed in a case in which the Section 1983 defendant was a private firm—as opposed to a private individual—it is unclear how the allegation of a symbiotic relationship between NYRA and New York State satisfies Plaintiff's burden of alleging that each of the Board Defendants as individuals engaged in state action. We consider each of these difficulties in turn.

---

1. For reasons explained in Subsection III.A below, Broman and Schwartz may not be entitled to assert qualified immunity in defense to Plaintiff's direct participation claim.

### 1. The Symbiotic Relationship Test

A leading commentator has observed that "[a]lthough *Burton* has never been overruled, it has been narrowed to the point of being virtually unworkable as a state action doctrine." 1A Martin A. Schwartz, *Section 1983 Litigation* § 5.11, at 529 (3d ed.1997). This narrowing began in *Burton* itself, where the Court stressed that its holding was limited to cases in which "a state leases public property [to a private firm] in the manner and for the purpose shown to have been the case" there. *Burton*, 365 U.S. at 726, 81 S.Ct. 856. This holding was narrowed still further in *Rendell–Baker v. Kohn*, 457 U.S. 830, 843, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982), where the Court stated that a vital element of *Burton*'s holding was the conclusion that "the State profited from the [private actor's] discriminatory conduct." *See Burton*, 365 U.S. at 724, 81 S.Ct. 856 ("Neither can it be ignored . . . that profits earned by discrimination not only contribute to, but also are indispensable elements in, the financial success of a governmental agency.").

As a result of this narrowing process, the Court—with one possible exception—"has rejected every attempt to establish state action on the basis of *Burton*." Schwartz, *Section 1983 Litigation* § 512, at 526. Accordingly, the lower federal courts "usually reject state action claims based on the *Burton* symbiotic relationship doctrine . . . . generally follow[ing] the present Supreme Court's reading of *Burton* that the most significant fact that led to the finding of state action was the public authority's profiting from the [private actor's] discrimination." *Id.* at 528. For example, in *Morse v. North Coast Opportunities, Inc.*, 118 F.3d 1338, 1342 (9th Cir.1997), the Ninth Circuit held that a private, non-profit community action agency was not a state actor on the ground that "there is no evidence here that the federal government profited from any alleged constitutional violation in the [agency's] decision to approve [plaintiff's] termination

[from employment]." *See also Barrios–Velazquez v. Asociacion De Empleados Del Estado Libre Asociado De Puerto Rico*, 84 F.3d 487, 495 (1st Cir.1996); *Gallagher v. "Neil Young Freedom Concert"*, 49 F.3d 1442, 1453 (10th Cir.1995); *Albright v. Longview Police Dept.*, 884 F.2d 835, 841 (5th Cir.1989); *Adams v. Vandemark*, 855 F.2d 312, 315 (6th Cir. 1988).

The handful of lower federal court cases that have found state action based on the symbiotic relationship doctrine fall into two categories. First, a few cases explicitly acknowledge the requirement that the governmental entity profit from the state actor's alleged constitutional violation, and then go on to find that this requirement has indeed been met. *See Heinrich v. Sweet*, 62 F.Supp.2d 282, 310 (D.Mass. 1999); *Citizens to End Animal Suffering and Exploitation, Inc., v. Faneuil Hall Marketplace, Inc.*, 745 F.Supp. 65, 74 (D.Mass.1990). Second, the remainder of the cases fail to acknowledge this requirement, basing their respective findings of state action, instead, on findings of a high degree of general interdependence between the private actor and the government. *See Jatoi v. Hurst–Euless–Bedford Hosp. Authority*, 807 F.2d 1214 (5th Cir. 1987) (hospital board of trustees' alleged constitutional violation constitutes state action where state benefitted financially from operation of hospital and "retained the ability to prevent or control racial discrimination by [the board of trustees]"); *Krynicky v. University of Pittsburgh*, 742 F.2d 94 (3d Cir.1984) (finding state-supported and supervised private university to be state actor); *Stevens v. New York Racing Association, Inc.*, 665 F.Supp. 164 (E.D.N.Y.1987).

■ As its title indicates, the most important of these cases for our purposes is *Stevens*, because the court there found NYRA to be a state actor on the basis of its symbiotic relationship with the State of New York. The *Stevens* court based its finding of a symbiotic relationship between

NYRA on the following factors, among others: (1) NYRA "was created under a law whose purpose, in part, was to enable the State to derive a reasonable revenue for the support of government"; (2) "[NYRA] is merely a conduit through which money passes from the betting public to the state's coffers"; NYRA, by statute, "must utilize its facilities and revenues to establish thoroughbred racing ... on such footing that it will command the interest as well as the confidence and favorable opinion of the public"; and (4) "the governor [is required] to appoint three members to [NYRA's] 20 member board of trustees." *Id.* at 172–73 (citations and quotations omitted).

These factors unquestionably establish that NYRA and the State are interdependent to a very high degree. They do not necessarily establish, however, the existence of a "symbiotic relationship" under reigning Supreme Court precedent. As noted, the most important aspect of *Burton*'s holding, according to subsequent Supreme Court opinions, is its holding that "profits earned by discrimination not only contribute[d] to, but also [were] indispensable elements in, the financial success of a governmental agency." *Burton,* 365 U.S. at 724, 81 S.Ct. 856. Not only did the *Stevens* court make no such finding, but it omitted discussion of this requirement entirely. As such, we are hesitant to treat *Stevens* as persuasive authority on the issue of NYRA's status as a state actor.

This brings us to the present case. In support of her claim that NYRA and the State are entwined in a symbiotic relationship, Plaintiff cites many of the same factors cited by the *Stevens* court. (See 1st Am.Comp. ¶¶ 67–68.)[2] Furthermore, Plaintiff also follows *Stevens'* lead in that she does not allege that the "profits earned by [the Board Defendants' alleged unconstitutional conduct] not only contribute[d] to, but also [were] indispensable

elements in, the financial success of [the NYRA/State joint venture]." As such, Plaintiff has not sufficiently alleged the existence of a symbiotic relationship.

## 2. The Insufficiency of Alleging a Symbiotic Relationship

█ This brings us to the second problem besetting Plaintiff's reliance on the symbiotic relationship test. As the preceding analysis of this test indicates, this test was developed in a case involving a private firm or corporation (as opposed to a private individual), and has, accordingly, been applied in subsequent cases involving private firms—including, especially, *Stevens* itself. In suing the Board Defendants in their individual capacities, however, Plaintiff is required to allege that each Board Defendants' individual conduct constituted state action. *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (noting that "the personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983"). The allegation that NYRA's conduct constituted state action cannot be bootstrapped into an allegation that each Board Defendants' conduct constituted state action. Of course, a corporation can only act by way of its directors and officers, and a sufficient allegation that the Board Defendants, acting in their *official* capacities as NYRA Trustees, engaged in state action could support an allegation that NYRA's conduct constituted state action. *See* Schwartz, *Section 1983 Litigation* § 7.2, at 7 & n. 30 (noting that "a suit against an official in an official capacity is tantamount to [a] suit against the entity") (*citing, inter alia, Monell v. Department of Social Servs.,* 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). The reverse inference, however, does not follow.

For the foregoing reasons, we conclude that Plaintiff's attempt to satisfy the state

---

**2.** The only significant difference between the two lists of factors concerns the number of Board members appointed by the Governor.

Plaintiff notes that 1997 legislation increased this number from three (of 20) to eight (of 28). (1st Am.Comp.¶ 122.)

action requirement by alleging the existence of a symbiotic relationship between NYRA and New York State is unsuccessful. We turn, then, to her second state action argument.

### B. The State–Imposed Duty Claim

■ In contrast to Plaintiff's first state action argument, this second argument addresses the requirement of alleging that each Board Defendants' individual conduct constituted state action. It rests on the idea that if state law imposes on a private individual the duty to prevent unconstitutional conduct by others under his control, alleging that he breeched this duty satisfies the state action requirement. *See Doe v. Claiborne County*, 103 F.3d 495, 512 (6th Cir.1996) ("[T]o state a claim for a failure to act when the alleged wrongdoer is not a supervisory government official, a plaintiff must separately establish the 'color of law' requirement of section 1983 by identifying some cognizable duty that state or federal law imposes upon the alleged 'enactor.' In the absence of a duty there is no section 1983 liability because the failure to act cannot be said to have occurred under color of law.").

In their motion to dismiss Plaintiff's original complaint, the Board Defendants argued that Plaintiff was seeking to impose 1983 liability on them on the basis of the mere fact that they are corporate directors. (*See* 1st Memo. at 6.) In response, Plaintiff contended that "the theory of liability is not predicated upon the Board Defendants' status as directors *qua* directors, but, instead, upon their breach of duties spelled out in NYRA's By–Laws, as well as in the New York State Racing and Wagering Law." (Memo. for Leave to

File Am.Comp. at 2.) More specifically, Plaintiff alleges that, pursuant to New York State law, "Defendant NYRA was required to include in its By–Laws a provision that imposes upon its Trustees the express duty and obligation to 'remove or dismiss, after specification of and hearing on charges, any director or Trustee or executive officer of [NYRA] for inefficiency, neglect of duty, misconduct or malfeasance in office or waste or action considered not to be in the best interests of racing generally.'" (1st Am.Comp. ¶ 121 (*quoting* N.Y. Racing Law § 202) (*citing* 1st Am.Comp. Ex. D. at 4 (N.Y.RA's By–Laws, art. III, §§ 4 & 5)).)[3] According to Plaintiff, this statutory mandate imposed on the Board Defendants the "dut[y] and responsibilit[y] to investigate and commence removal proceedings when they learned that officers, fellow-directors and employees of Defendant NYRA were violating the Constitutional rights of State-licensees engaged in lawful activity at race tracks owned and operated by Defendant NYRA pursuant to its exclusive State franchise."[4] (1st Am.Comp. ¶ 123.)

This argument is unpersuasive for two reasons. First, as the Board Defendants correctly point out, Plaintiff's reading of these provisions is highly misleading. (*See* 2d Reply, at 5–6.) Plaintiff fails to mention that the obligation to "remove or dismiss" arises only "upon request of the state racing and wagering board." N.Y. Racing Law § 202 (1999). Similarly, Article III, Section 5 of NYRA's By–Laws provides in relevant part that this obligation arises only "[i]f the State Racing and Wagering Board shall at any time request" that such removal proceedings be commenced. (1st Am.Comp. Ex. D. at 4.) As Plaintiff does not allege that the State

---

3. We note that Plaintiff presumably also intended to cite Article V, Sections 16 and 17 of NYRA's By–Laws, as they concern the removal of NYRA's executive officers; Sections 4 and 5 of Article III concern only removal of NYRA's trustees.

4. Although Plaintiff suggests that this second state action argument applies just as much to

her direct violation claim against Broman and Schwartz, (see 1st Am.Comp. ¶ 124), as it does to her indirect violation claim against all of the Board Defendants, it is evident that it can only support the latter claim. Hence, the following discussion of this argument is confined solely to this latter claim.

Racing and Wagering Board requested the removal or dismissal of either Noe or Meyocks, she has *ipso facto* not alleged that the Board Defendants had a duty to remove or dismiss Noe or Meyocks.

As for Article III, Section 4 of NYRA's By–Laws, it provides in pertinent part that the Trustees *"may in their discretion* and with or without cause ..., by a majority vote, remove any elected trustee or trustees and elect a new trustee or trustees in place thereof...." (*Id.* (emphasis added).) Unlike Section 5, this Section is not mandated by Section 202 of the New York Racing Law. Nor does it impose any duty whatever on NYRA's Trustees. As Plaintiff's counsel admitted at oral argument, Section 4 *"permits* [the Trustees] to perform the same action [mandated by Section 5] under their own initiative." (1st Tr. at 22 (emphasis added).) In other words, it merely gives them the *power* of removal. However, "a supervisor's mere failure to exercise his *power* of control does not, without more, provide a basis for imposing supervisory liability. The opposite conclusion would result in *respondeat superior* liability." Schwartz, *Section 1983 Liability,* § 7.19, at 119 (*citing Monell v. Department of Social Servs.,* 436 U.S. 658, 694 n. 58, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976)). The Supreme Court has explicitly rejected *respondeat superior* liability in the context of Section 1983 litigation. *See Monell,* 436 U.S. at 691, 98 S.Ct. 2018. It follows that

Section 4 can no more support Plaintiff's allegation that the Board Defendants had a duty to investigate and remove Noe and Meyocks than can Section 5.[5]

A second problem that besets Plaintiff's state-imposed duty argument stems from the fact that we are here concerned with Plaintiff's suit against the Board Defendants' in their individual capacities.[6] In *Doe v. Claiborne County Board of Education,* 103 F.3d 495 (6th Cir.1996), plaintiff brought a Section 1983 action against the members of the County School Board in their individual capacities, alleging supervisory liability. The Sixth Circuit based its finding that plaintiff had insufficiently alleged the state-imposed duty requirement on the fact that, by statute, "the individual board members had no individual supervisory responsibilities other than those imposed on the School Board as a whole. Although the School Board can act as an entity, and indeed as a governing body it has the statutory duty to supervise school personnel, the individual School Board Members cannot 'act' independently." *Id.* at 511. Much the same can be said of the Board Defendants in the present case. Even if the statutory and By–Laws provisions cited by Plaintiff imposed duties, these duties would be imposed only on the Trustees as a governing body—not on individual Trustees. As such, these provisions could not impose a duty on the Board Defendants as individuals to prevent or remedy the alleged constitutional violations of their supervisees.

**5.** Plaintiff also alleges that the Board Defendants' supposed statutory duties were "underscored when, in September 1997, the State Legislature passed legislation ensur[ing] public accountability of [NYRA] by providing additional oversight mechanisms." (1st Am. Comp. ¶ 122 (citation and internal quotation omitted).) These mechanisms included increasing the number of NYRA Trustees appointed by the Governor from three to eight. (*See id.*) Even if NYRA's Trustees did have a statutory duty to prevent or remedy constitutional torts visited on third parties by NYRA's executive officers, we fail to see how this increase in the number of appointed board members would enhance this duty. At most,

the increase could serve only as evidence that the State wished to increase the likelihood that the Trustees would carry out this duty.

**6.** Plaintiff's suit against the Board Defendants in their official capacities as NYRA Trustees is subsumed in her suit against NYRA itself. *See* Schwartz, *Section 1983 Litigation* § 7.2, at 7 & n. 30 (noting that "a suit against an official in an official capacity is tantamount to [a] suit against the entity") (*citing, inter alia, Monell v. Department of Social Services,* 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)).

In light of the foregoing, we find that Plaintiff has not sufficiently alleged that the Board Defendants had a state-imposed duty to prevent Defendants Noe's and Meyocks' alleged violations of her constitutional rights.

Having thus found that each of Plaintiff's state action arguments fails, we conclude that Plaintiff has failed sufficiently to allege state action.

## II. Plaintiff's Two Deprivation Claims

Even assuming that Plaintiff had sufficiently alleged state action, she would still have to satisfy the first Section 1983 requirement: She would have sufficiently to allege a deprivation of her constitutional rights. As noted, Plaintiff advances two such claims: the allegation that Broman and Schwartz directly violated her rights, and the allegation that all of the Board Defendants indirectly violated her rights. We consider each in turn.

### A. The Direct Violation Claim

▇ We begin with Plaintiff's allegations concerning Board Defendant Broman. Plaintiff alleges that Broman directly participated in the constitutional torts committed by Noe and Meyocks when, on June 23, 1998, he—acting in his capacity as a NYTB Board member—conveyed to the NYTB Board Noe's remarks that Plaintiff, because of her representation of Dr. Galvin, "was not to be appointed to the [NYTB] Board," and was "anti-NYRA." (1st Am.Comp.¶¶ 54, 55.)

The Board Defendants counter that this allegation of direct participation fails because (a) "Mr. Broman is sued here only for acts performed while a NYRA Board Member, not a member of the NYTB board," and (b) "plaintiff does not (and cannot) allege that Mr. Broman was a Board Member of NYRA at the time he

allegedly committed this single act of supposed wrongdoing." [7] (2d Memo. at 4.)

Plaintiff retorts that [t]he Board Defendants' belated revelation [that Broman did not become a member of NYRA's Board until December 18, 1998] merely changes the basis for, not the fact of, Broman's liability. This is so because, " 'to [a]ct under 'color of law' does not require that the [defendant] be an officer of the State. It is enough that he is a willful participant in joint activity with the State or its agents.' " (2d Memo.Opp. at 14 n. 4). (*quoting Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).)

The Board Defendants counter that "Plaintiff cannot cure the defect of her allegation regarding Mr. Broman by belatedly asserting liability against him under the test set forth in *Adickes* .... Plaintiff did not plead the requisite willful participation in a conspiracy or understanding between Broman as NYTB Board Member and any member of NYRA to subject Broman to suit under Section 1983. Conclusory allegations of conspiracy are not sufficient to survive a motion to dismiss." (2d Reply, at 7 n. 7 (*citing Sykes v. James*, 13 F.3d 515, 520 (2d Cir.1993) *cert. denied,* 512 U.S. 1240, 114 S.Ct. 2749, 129 L.Ed.2d 867 (1994)).) We agree. The allegation that Broman conveyed Noe's negative remarks about Plaintiff to the NYTB falls far short of alleging that Broman had reached an agreement with Noe to harm Plaintiff.

Turning to Board Defendant Schwartz, Plaintiff alleges that Schwartz directly participated in the constitutional torts allegedly committed by Noe and Meyocks when, in the fall of 1997, he permitted them falsely to register the ownership of two of his horses in the name of their undercover investigator—in pursuance, that is, of their alleged vendetta against

---

**7.** Plaintiff cannot allege this because "it is a matter of public record that Mr. Broman was not appointed to NYRA's Board until December 18, 1999," (2d Memo. at 4 n. 7.), weeks after Plaintiff suffered her fourth and final

alleged injury. *See Pani v. Empire Blue Cross Blue Shield,* 152 F.3d 67, 75 ("It is well established that a district court may rely on matters of public record in deciding a motion to dismiss under Rule 12(b)(6) ....").

Dr. Galvin. (*See* 1st Am.Comp. ¶¶ 126–27.)

The Board Defendants counter that "[e]ven if plaintiff's conclusory allegations on this subject described wrongful acts, such acts were said to have been directed against someone other than plaintiff [viz., Dr. Galvin], and so have no bearing on Mr. Schwartz's alleged liability to plaintiff." (2d Memo. at 5.) We agree.

In view of the foregoing, we conclude that Plaintiff has failed sufficiently to allege that Defendants Broman and Schwartz directly participated in Defendants Noe's and Meyocks's alleged violations of Plaintiff's constitutional rights.

### B. The Supervisory Liability Claim

■ To state a valid Section 1983 claim under a theory of supervisor liability, a plaintiff must sufficiently allege, first, that the supervisor's supervisees violated her constitutional rights. The Board Defendants concede that Plaintiff has sufficiently alleged this underlying violation because they concede—albeit solely for the purposes of the present Motion—that she has sufficiently alleged that their supervisees, Noe and Meyocks, violated her rights. (*See* 1st Tr. at 4.) Once this threshold requirement has been satisfied, Plaintiff must allege the remaining requirements of supervisory liability.

■ As noted, "the personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Colon,* 58 F.3d at 873. When supervisory liability is alleged, such personal involvement may be shown in one or more of the following five ways:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of [plaintiff] by failing to act on information indicating that unconstitutional acts were occurring.

*Id.* Plaintiff elects to proceed via the fifth route, alleging that the Board Defendants are liable because they "have been and continue to be deliberately indifferent to the discharge of their statutory and corporate duties." (*Id.* ¶ 132.)

■ To sufficiently allege supervisory liability via deliberate indifference, a Section 1983 plaintiff must allege each of the following: (1) that "federal or state law imposed a duty upon the supervisor to [intervene in some way]," Schwartz, *Section 1983 Litigation* § 7.19, at 120 (citing cases), (2) that the supervisor "has actual or constructive notice of unconstitutional practices" carried out by his supervisees—which notice triggered his duty to intervene—yet deliberately failed to take such action, thereby breaching this duty, *Meriwether v. Coughlin,* 879 F.2d 1037, 1048 (2d Cir.1989), and (3) that this "breach of that duty was the proximate cause of the claimant's injury." Schwartz, *Section 1983 Litigation* § 7.19, at 121. We have already concluded, in Section I.B, that Plaintiff has failed sufficiently to allege the first element. We are assuming in this Section, however, that she has sufficiently alleged it. As such, we turn to a consideration of the second and third elements. Plaintiff alleges that the Board Defendants "had knowledge, or, had they diligently exercised their statutory and corporate duties to investigate, control and discipline on a continuing basis, should have had knowledge of Defendants NYRA's, Noe's and Meyocks' unlawful, tortious and unconstitutional acts." (1st Am.Comp.¶ 129.)

In support of this allegation, Plaintiff presents numerous "evidentiary" allegations, the most important of which we examine below. Before doing so, however,

we consider the Board Defendants' general response to these allegations, viz., that "plaintiff does not allege that the Board Members were on notice, as a matter of governing law, that *her* rights were at risk.... Indeed, the Amended Complaint makes *no* cognizable allegation of deliberate indifference toward plaintiff at all." (2d Memo. at 12.)

Plaintiff, in response, largely concedes this point, but hastens to add that "it is *not* necessary to allege that the unconstitutional acts or practices which provided notice of the need to act were visited upon plaintiff, personally." (2d Memo.Opp. at 12.) Rather, a "defendant['s] willful indifference to *past* unconstitutional torts against *others* [can] create[ ] the 'clear risk of future unlawful action' against the plaintiff." (*Id.* at 12–13 (quoting *Camilo–Robles v. Zapata,* 175 F.3d 41, 44 (1st Cir. 1999) (emphasis added by Plaintiff)).) Hence, given "the multiple unconstitutional acts that were visited upon Plaintiff's client, Dr. Galvin; upon Dr. Galvin's witnesses; and, ultimately, upon ... plaintiff her[self].... [s]urely, at some point, a reasonably attentive supervisor would have recognized that multiple retaliatory acts

against multiple State-licensees signaled a 'clear risk of future unlawful action' against other licensees—including, ultimately, Plaintiff." (*Id.* at 13 (citations omitted).) We assume the correctness of this contention arguendo.[8]

The question thus becomes when this point of required intervention was reached. In answering this question, it is important to keep in mind the dates on which Noe's and Meyocks' four alleged violations of Plaintiff's constitutional rights occurred. Three (viz., her termination as NYTHA's General Counsel, NYRA's alleged withdrawal of support for the day care center, and the decision not to appoint her to the NYTB board) occurred in or about the period from June 18, 1998 to June 23, 1998, while the fourth—her arrest at and expulsion from Belmont Park Racetrack—occurred on December 4, 1998. Needles to say, if the point of intervention was reached after December 4, 1998, the Board Defendants cannot be found liable for failing to prevent the harms that were allegedly visited on Plaintiff. Keeping these dates in mind, we turn to a consideration of Plaintiff's most important allegations in support of actual or constructive notice.

**8.** As Plaintiff's reliance on *Camilo–Robles,* a First Circuit opinion, indicates, the Second Circuit has yet to adopt this "transitive" theory of deliberate indifference, whereby a supervisor's actual or constructive notice of constitutional torts against one plaintiff can serve as the basis of a finding of deliberate indifference to the rights of a subsequent plaintiff. We note, however, that this theory is consistent with the holding of one of the Second Circuit's leading "deliberate indifference" cases, viz., *Meriwether v. Coughlin,* 879 F.2d 1037 (1989). *Meriwether* involved a jury finding that two senior supervisory officials of the New York State correctional system were deliberately indifferent to the constitutional rights of inmates who had been beaten by correctional officers. Finding that these two officials "should have known that the plaintiffs' reputations would expose them to extreme hostility from corrections officers," the *Meriwether* majority upheld the jury's finding of deliberate indifference on the ground that the officials, despite this constructive notice, "took no precautions to ensure the safety of the plaintiffs." *Id.* at 1048 (citation and inter-

nal quotation omitted). In dissent, Judge Mahoney complained that "the [majority's] application of the concept of 'constructive notice' to the facts of this case to impose liability for a failure to predict and prevent eighth amendment violations undercuts the long established rule that: '*Respondeat superior* or vicarious liability will not attach under § 1983.'" *Id.* àt 1051 (quoting *City of Canton v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)). He suggested, however, that a finding of deliberate indifference may have been appropriate if "prior such incidents had occurred which should have alerted defendants to the necessity of closer supervision or better training of their subordinates." *Id.* Hence, given that this last position just is the *Camilo–Robles* "transitive" theory, and that the *Meriwether* majority's theory of liability is even easier to allege than the transitive theory, it follows that the transitive theory falls within the Second Circuit's current thinking on the issue of deliberate indifference. As such, we will not quibble with Plaintiff's reliance on it.

**502**

Plaintiff alleges that "Defendants Noe's and Meyocks' unconstitutional campaign to destroy Dr. Michael J. Galvin's veterinary practice was widely reported—and soundly criticized—in the press," and that their unlawful campaign against Plaintiff ... was likewise widely reported—and soundly criticized—in the press. (1st Am.Comp. ¶¶ 131(c) & (d).)[9] The first of these press reports appeared on June 22, 1999. (*See id.* Exs. G & H.) As such, even had Plaintiff alleged that the Board Defendants had read or should have read these reports (neither of which she does allege), these reports could not have given the Board Defendants notice sufficient for them to have prevented the first three alleged harms to Plaintiff. By the same token, however, these reports could have provided notice sufficient to enable them to prevent her arrest on December 4, 1998. The question is whether these reports triggered their (assumed) "duty to investigate and remove" Noe and Meyocks. In this regard it is important that, as just noted, Plaintiff does not allege that the Board Defendants were or should have been aware of these reports. Even if she had, however, we would still have to determine the point at which their duty to intervene was triggered.

In making this determination, we cannot seek guidance from previous cases involving corporate directors. As the parties acknowledge, Plaintiff's supervisory liability claim against the directors of a private corporation presents an issue of first impression. Hence, there are no such cases from which to seek guidance. Instead, as Plaintiff herself suggests, we must look to roughly analogous cases involving "prison supervisors" and "senior management ... in a police department." (1st Tr. at 21.) One of the Second Circuit's leading deliberate indifference opinions, *Colon v. Coughlin,* 58 F.3d 865 (1995), is especially instructive in this regard. In *Colon,* the plaintiff inmate alleged that the superintendent of the correctional facility in which he was housed displayed deliberate indifference by failing to respond to his letter accusing correctional officers of planting contraband in his cell. *Id.* at 873. Noting that the letter was received prior to the commencement of a required administrative proceeding on the matter, the court held that there was "no reason why [the superintendent] should have intervened in advance of an established procedure in which [plaintiff] was to be given the opportunity to substantiate the claim he made in his letter." *Id.* Similarly, in *White–Ruiz v. City of New York,* 983 F.Supp. 365 (S.D.N.Y.1997), the defendant police officer argued that the police commissioner evinced deliberate indifference to her retaliation charge against other officers because—despite having been put on constructive notice of these charges by a lawsuit against the department—he failed to respond to her charges for many months. In rejecting this argument, the court reasoned that

---

**9.** The remainder of Plaintiff's allegations in support of notice can be dispensed with in short order. Plaintiff alleges, first, that "[i]n October, 1997, the Offices of the New York State Attorney General and Comptroller issued a joint report" highly critical of NYRA's senior management. (1st Am.Comp.¶ 131(a).) As the Board Defendants persuasively argue, given that this report "mentions not one word about constitutional violations, [it] cannot serve as a basis for the imputation of notice that they might occur." (1st Reply, at 4 n. 4.) Second, Plaintiff alleges that "Defendants NYRA's, Noe's, and Meyocks' unconstitutional actions against Plaintiff and Dr. Galvin [and others] have been brought to the attention of individual Board Defendants by past and current clients of Plaintiff and/or Dr. Galvin [and by others]." (*Id.* ¶ 131(e) & (f).) As Plaintiff has failed to allege when these reports were given, they may have been given some time after Plaintiff's alleged injuries occurred, i.e., too late to provide the Board Defendants with notice sufficient to enable them to prevent these injuries. Third, Plaintiff alleges that "[i]n or about February 1999, Defendants NYRA, Noe and Meyocks authorized the commencement of a new disciplinary proceeding against Plaintiff's client, Dr. Galvin." (*Id.* ¶ 131(h).) As this new proceeding was not commenced until February 1999, it could not have provided the Board Defendants with notice sufficient to enable them to prevent any of Plaintiff's alleged injuries.

[u]nlike an internal grievance or complaint, which will presumably be handled administratively, it is likely that such a court-filed complaint will first be addressed by legal counsel, with due regard for the defendants' legal exposure. Once an officer's grievances are embodied in such a format, I would expect that an administrative response would come more slowly and would more likely reflect the attorneys' assessment of litigation considerations, and is thus less likely to embody the policies of the Commissioner.

*Id.* at 390.

In light of these two opinions, we think that the Board Defendants duty to intervene could not have been triggered prior to September 28, 1998, the date on which the District Court granted Dr. Galvin's motion for a preliminary injunction ordering reinstatement of his NYRA credentials. Had the Board Defendants been aware of the proceedings on this motion (via press reports or otherwise), it would have been reasonable for them to await the District Court's decision before taking action against Noe and Meyocks. Furthermore, even if we assume that the Board Defendants should have been aware of this decision, their failure to begin an investigation of Noe and Meyocks immediately after it was announced does not rise to the level of deliberate indifference—for the following two reasons. First, the District Court's decision is concerned solely with Noe's and Meyocks' violations of *Dr. Galvin's* rights. Although the Magistrate Judge's Report and Recommendation does indeed contain a single paragraph chiding Noe and Meyocks for refusing to deal with Plaintiff because of her representation of Dr. Galvin, this paragraph was not adopted by the District Court. Similarly,

although some of the news reports do indeed include brief references to Noe's and Meyocks' alleged actions against Plaintiff, these are typically buried in articles overwhelmingly concerned with their actions against Dr. Galvin. Hence, it is highly doubtful that the Board Defendants should have been aware of Noe's and Meyocks' alleged violations of *Plaintiff's* rights. When this conclusion is added to our earlier negative assessment of Plaintiff's allegations that the Board Defendants should have been aware of violations against individuals other than Dr. Galvin and Plaintiff, *see supra* note 10, it follows that the Board Defendants knew or should have known only of Noe's and Meyocks' alleged violations of *Dr. Galvin's* rights. As such, Plaintiff has failed to support her claim that the Board Defendants should have been aware of "multiple retaliatory acts against multiple State-licensees." (2d Memo.Opp. at 13.)[10]

Second, given (a) that the District Court merely granted a preliminary injunction, and (b) that Noe and Meyocks had decided to appeal the court's decision, we cannot say that it would have been unreasonable for the Board Defendants to await the outcome of the appeal before launching an investigation. Here again, such hesitation could amount to no more than negligence.

On the other hand, once the Second Circuit affirmed the preliminary injunction order, the Board Defendants' (assumed) duty to investigate was arguably triggered. However, as this affirmance did not occur until December 23, 1998—weeks after Plaintiff's arrest on December 4, 1998—it could not have provided the Board Defendants with notice sufficient to enable them to prevent this arrest. In other words, their failure to act on the basis of this

**10.** Plaintiff presumably made this claim in recognition of the fact that failure to intervene upon notice of a single incident does not rise to the level of deliberate indifference. At most, inaction under such circumstances constitutes negligence. *Cf.* Schwartz, *Section 1983 Litigation* § 7.18, at 109 (noting that

"[w]hen municipal liability is sought to be based upon deficiencies in *supervision, discipline,* or *remedial action....* [t]here must be, in the face of a *practice* of *widespread* constitutional violations, a *deliberately indifferent* failure to take protective or corrective action") (second emphasis added).

notice could not have proximately caused Plaintiff's arrest.[11]

In sum, we find that Plaintiff has insufficiently alleged (a) that the Board Defendants had actual or constructive notice sufficient to enable them to prevent her injuries, and (b) that their failure to intervene proximately caused these injuries.

In view of the foregoing, we find that Plaintiff has failed sufficiently to allege supervisory liability.

### III. Qualified Immunity

Even assuming that Plaintiff had sufficiently alleged both Section 1983 elements, her supervisory liability claim against the Board Defendants would not succeed in any event because they have validly pled qualified immunity. The basic test for determining whether a public official is entitled to assert qualified immunity was established by the Supreme Court in *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). When the defendant is a private actor, however, a court must first determine whether qualified immunity is even available to the defendant. This is because "private actors are not automatically immune (i.e., § 1983 immunity does not ·automatically follow § 1983 liability)." *Richardson v. McKnight*, 521 U.S. 399, 412, 117 S.Ct. 2100, 138 L.Ed.2d 540 (1997). We first consider this general availability question, in Subsection III.A, and then proceed to the *Harlow* qualified immunity test in Subsection III.B.

### A. General Availability of Qualified Immunity

■ The determination whether a private actor is entitled to assert qualified immunity is governed by the two-part test formulated by the Supreme Court in *Richardson*. Courts are to determine, first, whether "[h]istory ... reveal[s] [that] a 'firmly rooted' tradition of immunity [is] applicable" to the type of private actors involved in the case, 521 U.S. at 404, 117 S.Ct. 2100, and, second, "[w]hether the [qualified] immunity doctrine's purposes warrant immunity" for this type of private actor, *id.* at 407, 117 S.Ct. 2100. Applying this test to privately employed prison guards, the Court found neither requirement to be satisfied, and thus held that they were not entitled to qualified immunity. *Id.* at 412, 117 S.Ct. 2100.

■ Plaintiff argues that the Board Defendants satisfy neither prong of the *Richardson* test. First, the history prong is not satisfied because "[t]here is ... no tradition of governmental immunity for private parties engaged in 'horse racing' owing ... to the fact [that] the conduct of racing is not a normal governmental activity." (2d Memo.Opp. at 6.) Although Plaintiff is presumably correct in claiming that the conduct of horse racing is not a normal government activity, and that there is no tradition of qualified immunity for private parties engaged in horse racing, it is far from clear that the assumptions underlying Plaintiff's argument are correct. *Richardson* itself involved a class of private actors, viz., prison guards, who were performing a function typically performed by public employees. Hence, the Court's historical inquiry focused on whether there was a tradition of granting qualified immunity to private actors performing this traditional public function. This raises the

---

11. The preceding analysis largely obviates Plaintiff's remaining notice allegation, viz., that Plaintiff's and Dr. Galvin's law suits "ha[ve] been the subject of discussion at several of the Board of Trustees meetings that have been conducted, on a monthly basis, between June 1998 and the present date." (*Id.* ¶ 113(g).) Given that this claim focuses on the Board's discussion of the litigation, it adds little, if anything, to Plaintiff's allegations concerning the press reports. At most,

such meetings would provide a basis for alleging that all or most of the Board Defendants had *actual* notice of the District Court's order of September 28, 1998, i.e., because one or more of the Board Defendants who was aware of the court's determination informed the others of it at the October or November meetings. This additional allegation would have no appreciable effect on the preceding determination of when the Board Defendants' duty to intervene was triggered.

question of how the history prong is to be applied when the private actors are *not* performing a traditional public function. Plaintiff simply assumes that, in such circumstances, the defendant will be unable to satisfy the history prong. Because the role is not a traditionally public role, she reasons, there can be no tradition of granting immunity to private actors performing it.

The problem with this assumption is that it reads *Richardson* as holding that qualified immunity is available only to private actors who perform traditionally public roles. But this amounts to saying that qualified immunity is available only to private actors whose state actor status has been established via the Supreme Court's "exclusive public function" test. *See Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 353, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974) ("We have ... found state action present in the exercise by a private entity of powers exclusively traditionally reserved to the State.") Private actors who have been determined to be state actors by any of the other three tests[12] are simply out of luck. Not only is there no indication in *Richardson* that the Court intended such a result, but there is little to recommend such a dichotomy. Such a dichotomy certainly finds no support in the policy underlying the history prong, viz., the Court's *general* policy of "accord[ing] im-

munity [in § 1983 suits] where a tradition of immunity was firmly rooted in the common law." *Id.* at 403, 117 S.Ct. 2100 (citations and internal quotations omitted). Hence, it is more reasonable to assume that, in cases in which state action has been established by one of these three other tests, the Court intends lower courts to apply the two-part *Richardson* test *mutatis mutandis.*[13] In such cases, courts should thus ask not—as Plaintiff would have it—whether there is a tradition of "governmental immunity" for private parties engaged in the activity in question, but simply whether there is a tradition of common law immunity for private parties engaged in the activity.

Turning to the case *sub judice*, Plaintiff would presumably hasten to point out that this alternative formulation would be of no help to the Board Defendants because there is no tradition of common law immunity for parties engaged in horse racing. Although Plaintiff is presumably correct in claiming that no such tradition exists, it is not at all clear that Plaintiff's characterization of the role performed by the Board Defendants is correct. The Board Defendants argue, in contrast, that they are performing the role of corporate directors, and that there *is* a firmly rooted tradition of common law immunity for persons performing this role. The question thus becomes which of these two characteriza-

12. Namely, the symbiotic relationship test, the close nexus test, *see Blum v. Yaretsky*, 457 U.S. 991, 1004, 102 S.Ct. 2777, 73 L.Ed.2d 534 ("[A] State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement ... that the choices must in law be deemed to be that of the State."), and the "joint participation test," *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) (citation and internal quotations omitted) ("To act 'under color' of law does not require that the [defendant] be an officer of the State. It is enough that he is a willful participant in joint activity with the State or its agents.").

13. In this regard it should be noted that, in *Richardson* itself, the Court was faced with this same problem vis-a-vis its earlier decision

in *Wyatt v. Cole*, 504 U.S. 158, 112 S.Ct. 1827, 118 L.Ed.2d 504 (1992). In *Wyatt*, the Court was presented with the question of whether "private persons, who conspire with state officials" are entitled to qualified immunity. *Id.* at 168, 112 S.Ct. 1827. (That is, it was presented with private officials who qualified as state actors under the joint participation test.) Presented with the different question of whether employees of a private firm that had contracted to perform a governmental function are entitled to qualified immunity, the *Richardson* Court did not conclude that these employees were not so entitled because they had not conspired with the government. Rather, the Court applied *Wyatt*'s general twofold history/policy test *mutatis mutandis* to this somewhat different situation.

tions, if either, is correct. *Richardson* suggests that Plaintiff's characterization is off the mark. In *Richardson*, the Court characterized the role played by the private actors as that of "privately employed prison guards." *Richardson*, 521 U.S. at 404, 117 S.Ct. 2100. If Plaintiff's suggested approach had been followed in *Richardson*, the role would have been characterized as "private parties engaged in jailing." In other words, Plaintiff's characterization is somewhat too broad. The Board Defendants' characterization, in contrast, focuses on the specific role played by the Board Defendants in the private entity. Just as *Richardson* focused on the private prison management firm's guards—as opposed to its administrators or its cafeteria workers, so the Board Defendants focus on the private racing association's board of trustees—as opposed to its executive officers or its stable workers. We therefore find the Board Defendants' characterization (of the pertinent historical tradition) more appropriate than Plaintiff's. Hence, given that Plaintiff does not contest the Board Defendants' contention that there is a firmly-rooted common law tradition of affording corporate directors immunity from suit, we hold that the Board Defendants have satisfied the history prong of the *Richardson* test.

This brings us to *Richardson*'s "purpose" prong. The Court has held that public officials should be granted qualified immunity because doing so (1) "preserve[s] the ability of government officials to serve the public good" and "encourag[es] the vigorous exercise of official authority"; (2) "ensure[s] that talented candidates are not deterred by the threat of damages suits from entering public service"; and (3) ensures that officials will not be distracted from performing their governmental duties. *Id.* at 408, 117 S.Ct. 2100. Given that (a) the third of these reasons is little more than a variant of the first, and (b) the *Richardson* Court downplayed the importance of the third, *see id.* at 411–12, 117 S.Ct. 2100, we confine our attention to the first two.

According to *Richardson*, the first of these two "government immunity-producing concern[s]," is the "most important." *Id.* at 409, 117 S.Ct. 2100. The *Richardson* Court based its determination that this concern does not warrant extending qualified immunity to privately-employed prison guards on a finding that this concern "is less likely present, or at least is not special, when a private company subject to competitive market pressures operates a prison." *Id.* Because these pressures "encourage vigorous performance" of the guards' duties, there is no need to afford them qualified immunity to encourage such performance. *Id.* at 411, 117 S.Ct. 2100. In fleshing out this claim, the Court noted the following features of the private firm for which the guards worked: (1) The guards worked for a private firm "systematically organized to perform a major administrative task for profit"; (2) the firm "performs that task independently, with relatively less ongoing direct state supervision [than publicly operated prisons]"; (3) by statute, the firm "must buy insurance sufficient to compensate victims of civil rights torts"; (4) "since the firm's first contract expires after three years, its performance is disciplined, not only by state review, but also by pressure from potentially competing firms who can try to take its place"; and (5) "the contract's provisions—including those that might permit employee indemnification and avoid many civil service restrictions—grant this private firm freedom to respond to [this threat of replacement] through rewards and penalties that operate directly upon the employees." *Id.* at 409–10, 117 S.Ct. 2100 (citations omitted).

Plaintiff confines her attention to the fourth of these factors, arguing that "NYRA is subject to competitive market pressures, given that (i) its franchise is reviewable on a periodic basis, and (ii) is subject to termination by the State." (2d Memo.Opp. at 7.)

The Board Defendants respond that this argument is "disingenuous at best," (2d Reply, at 9 n. 8), and we are inclined to agree. Given that (1) NYRA, unlike the prison management firm in *Richardson*, was created by the state, and (2) the Governor of New York appoints eight members of NYRA's twenty-eight member board of trustees, there is little chance that the State will decide to replace NYRA with some other private corporation. Indeed, according to Plaintiff herself, the State reacted to complaints about NYRA's management and operations *not* by threatening to replace NYRA, but rather by increasing its control over NYRA, and extending its franchise an additional seven years. (*see* 1st Am.Comp. ¶ 122, Ex. E.)

Furthermore, unlike the prison management firm, NYRA—according to Plaintiff herself—performs its major administrative task with day-to-day supervision from the state. (*See id.* ¶ 69 ("[E]very aspect of the day-to-day activities at NYRA's tracks are supervised by the State.").) Nor has Plaintiff alleged that NYRA is statutorily required to "buy insurance sufficient to compensate victims of civil rights torts," or that NYRA's franchise agreement with the state "permit[s] employee indemnification."

This leaves only that portion of the fifth of the five preceding factors that concerns the prison management firm's freedom to employ "rewards and penalties that operate directly upon its employees." Given that the Board Defendants receive no compensation for their services, (*see* 1st Am. Comp.Ex. D, at 5 (N.Y.RA's By–Laws, art. III, § 8)), Plaintiff cannot plausibly allege that NYRA has the "freedom" to encourage the Board Directors' "vigorous performance" of their corporate and statutory duties by rewarding them. Indeed, given that public officials typically *are* compensated for their services, *Richardson*'s logic suggests that uncompensated corporate trustees or more in need of qualified immunity than governmental officials themselves. Nor can Plaintiff plausibly allege

that the potential imposition of penalties encourages the Board Defendants to perform their duties vigorously. In the case of ordinary corporations, the threat of such penalties is very real indeed in the form of shareholder suits and shareholder derivative suits. As Plaintiff is at pains to point out, however, NYRA is anything but an ordinary corporation. (*See* 1st Tr. at 25 ("NYRA is a unique corporation.").) NYRA's trustees and its shareholders are one and the same. (*See* 1st Am.Comp.Ex. D, at 10 (N.Y.RA's By–Laws art. VI, § 1 ("No capital stock of the Corporation shall be issuable or transferable to any person not a trustee of the Corporation.")); (*cf.* 1st Tr. at 23 (Plaintiff's counsel stating that "there would be [no stockholder suits] in this case, because [NYRA] is a nonprofit organization").) Hence, neither of the two types of shareholder suit is available to encourage the trustees to perform their duties vigorously. In this respect, NYRA's trustees more closely resemble government officials than ordinary board directors.

For all of these reasons, we conclude that, unlike the prison management firm in *Richardson*, NYRA is not really a market participant subject to competitive market pressures. As such, unlike the prison firm's employees, NYRA's trustees need the encouragement and protection of qualified immunity.

This brings us to the second, less important "immunity-producing concern," viz., the "need to ensure that talented candidates are not deterred by the threat of damages suits from entering public service." *Id.* at 411, 117 S.Ct. 2100 (citations and quotations omitted). The *Richardson* Court found that several of the same factors cited in its discussion of the first concern supported a finding that this concern, likewise, is largely inoperative in the private system in which the prison guards performed their duties. *See id.* Specifically, the Court noted that "the comprehensive insurance-coverage requirements . . . increase[ ] the likelihood of employee

indemnification and to that extent re-duce[ ] the employment-discouraging fear of unwarranted liability potential applicants face," and that "the private firm, unlike a government department, [can] offset increased employee liability risk with higher pay or extra benefits." *Id.*

As noted above, Plaintiff alleges neither that NYRA is required by statute to carry liability insurance for the constitutional torts committed by its employees, nor that NYRA indemnifies the Board Defendants. And given that, as noted, NYRA's trustees receive no compensation for their services, Plaintiff cannot plausibly allege that NYRA can "offset any increased trustee liability risk with higher pay or benefits." Hence, this second immunity concern provides a second reason for granting the Board Defendants qualified immunity from Section 1983 suits.

Summing up, our application of the history and policy prongs of the *Richardson* test leads us to conclude that the Board Defendants—insofar as they are being sued under a theory of supervisory liability—are entitled to assert qualified immunity in response to Plaintiff's Section 1983 claim.[14]

**B. Clearly Established Law**

 Having determined that qualified immunity is generally available to the Board Defendants, it remains to determine whether their assertion of it satisfies the requirements set forth by the Supreme Court in *Harlow v. Fitzgerald.* According to a recent Second Circuit opinion, subsequent Supreme Court cases have interpreted *Harlow* to require the following three-part, sequential test:

14. Whether this conclusion applies equally to Plaintiff's direct violation claim against Broman and Schwartz is unclear. On the one hand, the preceding conclusion that the Board Defendants' assertion of qualified immunity (i.e., in defense to Plaintiff's supervisory liability claim) satisfies the requirements of *Richardson*'s purpose prong arguably applies equally to Broman's and Schwartz's assertion of qualified immunity in defense to Plaintiff's direct violation claim against them. Yet, giv-

Under the *Harlow v. Fitzgerald* standard, a government official sued in his individual capacity, is entitled to qualified immunity in any of three circumstances: (1) if the conduct attributed to him is not prohibited by federal law; or (2) where that conduct is so prohibited, if the plaintiff's right not to be subjected to such conduct by the defendant was not clearly established at the time of the conduct; or (3) if the defendant's action was "objective[ly] legal[ly] reasonable[ ] ... in light of the legal rules that were clearly established at the time it was taken." These three issues should be approached in sequence, for if the second is resolved favorably to the official, the third becomes moot; a favorable resolution of the first moots both the second and the third.

*X–Men Security, Inc. v. Pataki,* 196 F.3d 56, 65–66 (2nd Cir.1999) (citations omitted).

We have already concluded, in Section II.B, that Plaintiff's First Amended Complaint fails the first part of this test: Plaintiff has not "sufficiently allege[d] the violation of a federal right." *Id.* at 66–67. We are assuming in this Section, however, that she has. Accordingly, we proceed to the second part of the test. In an important post-*Harlow* opinion, the Supreme Court acknowledged that

[t]he operation of this standard ... depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified.... [I]f the test of 'clearly established law' were to be applied at [a high] level of generality, it would bear no relationship to the 'objec-

en that the Board Defendants concede that there was no common law immunity in 1871 for corporate directors who directly participated in torts against third parties, (*see* 1st Memo. at 9), this latter assertion of qualified immunity clearly fails the history prong of the *Richardson* test. *Richardson* itself, however, is unclear as to whether a defendant must satisfy the requirements of both prongs to be entitled to qualified immunity.

tive legal reasonableness' that is the touchstone of *Harlow* .... [T]herefore, ... the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; it is to say, however, that in the light of pre-existing law the unlawfulness must be apparent.

*Anderson v. Creighton*, 483 U.S. 635, 639–40, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

The Supreme Court has yet to apply this general rule to cases in which the plaintiff asserts a failure to supervise. *See* Martin A. Schwarz, *Section 1983 Litigation in the Second Circuit*, N.Y.L.J., Feb. 17, 1998, at 3. The Second Circuit has suggested, however, that a supervisory official succeeds in asserting the defense if he can show that "the [applicable] standard of supervisory liability was not clearly established at the time the plaintiff's rights were violated...." *Id.* (*citing Al–Jundi v. Estate of Rockefeller*, 885 F.2d 1060, 1067 (2d Cir. 1989)).

The Board Defendants argue that they "have found no case in [the] context of Section 1983 in which liability has been imposed upon corporate directors at all, or in which a court even considered abrogating their common law immunity in the absence of any allegation of direct participation in wrongdoing." (1st Memo. at 17.) Consequently, "there is no clearly established supervisory liability standard for imposing liability here." (*Id.*)

Plaintiff's response to this argument is twofold. First, Plaintiff asserts that courts "*have* addressed the issue of private actor corporate liability under Section 1983." (1st Memo.Opp. at 19 (emphasis added).) Second, Plaintiff points out that "the law of supervisory liability, has, in fact, been 'long established' in this Circuit, and clearly was in full force and effect in 1998." (*Id.* at 21 (*citing Spencer v. Doe*, 139 F.3d 107, 112 (2d Cir.1998)).)

It is evident that this dispute "depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." The Board Defendants contend that the focus should be on a relatively specific rule imposing supervisory liability on corporate directors for their supervisees' constitutional torts. Plaintiff, in contrast, argues for two more general rules: one that imposes Section 1983 liability on employees of private corporations or firms generally, and another that imposes Section 1983 liability on anyone in a supervisory position.

The question thus becomes which of these rules, if any, is the correct one. *Anderson* instructs us to focus on whether "a reasonable official would understand that what he is doing violates" the rule in question. 483 U.S. at 640, 107 S.Ct. 3034. The Board Defendants were presumably aware that the officers and/or employees of NYRA and other such private corporations are subject to tort liability, but given that they were also aware that corporate directors cannot be sued for torts committed by their supervisees, they had no reason to believe that the former sort of liability somehow supercedes the latter. Similarly, even if the Board Defendants were aware that various types of public supervisory officials have been held liable for a failure to supervise, their (true) belief that corporate directors are not responsible for the torts committed by their supervisees made it reasonable for them to believe that the former rule posed no threat to the latter rule.[15]

---

**15.** In response to this reasoning, Plaintiff might claim that we have misunderstood her argument. She is arguing *not* that the Board Defendants should have realized that they were liable for the officers' constitutional torts in light of *each* of the cited rules considered individually; rather, she is arguing that the *conjunction* of these two rules put them

We find, therefore, that Plaintiff has failed adequately to allege that a "standard of supervisory liability" under which corporate directors are liable for the constitutional torts of their supervisees is "clearly established."[16] It follows that Plaintiff's Section 1983 claim against the Board Defendant's must be dismissed. *See Behrens v. Pelletier,* 516 U.S. 299, 306, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996) (citation and quotations omitted) ("Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery.").[17]

### Conclusion

For the foregoing reasons, the Board Defendants' Joint Motion to Dismiss Plaintiff's First Amended Complaint is granted in its entirety. Plaintiff's First Amended Complaint—insofar as it is directed at the Board Defendants—is dismissed.

SO ORDERED

---

on notice that they were so liable. Given (a) that officers and employees of private corporations have been found liable under Section 1983, and (b) that public supervisory officials have been found liable under Section 1983, the Defendants—being both "employees" of a private corporation and supervisory officials—should have realized that the courts were on the verge of joining these two rules together so as to find directors of private corporations liable under Section 1983 for the constitutional torts of their supervisees. We find this argument unpersuasive on its face.

**16.** As such, we need not reach the third part of the Harlow test; i.e., we need not determine whether the Board Defendants' viola-

tion of clearly established law was nonetheless objectively reasonable.

**17.** At the end of Plaintiff's Memorandum in Opposition to the Board Defendant's initial motion to dismiss, Plaintiff asserted that her Seventh Cause of Action—tortious interference with prospective economic advantage under New York State law—"is not asserted against the Board Defendants." (1st Memo. Opp. at 25 n. 7.) As the version of this cause of action in the First Amended Complaint is virtually identical to the version in the original Complaint, it appears that Plaintiff has not changed her mind on this point. Hence, we need not consider this cause of action within the context of the present Motion.